**Larry HICKSON and Kanako Hickson, Appellants,**

**v.**

**Jorge MARTINEZ, M.D., Colonial Hospital, Inc., Terrell Public Hospital Corp. d/b/a Terrell Community Hospital, American Medical International, Inc., and Professional Ambulance Service, Inc., Appellees.**

**No. 05–84–00933–CV.**

Court of Appeals of Texas, Dallas.

Dec. 10, 1985.

Rehearing Denied Feb. 20, 1986.

Second Rehearing Denied April 11, 1986.

Jack Ayres, Jr. P.C., Dallas, for appellants.

Roger Townsend, Fulbright & Jaworski, Dallas, for appellees.

Before STEPHENS, VANCE and McCLUNG, JJ.

McCLUNG, Justice.

Two year-old Byron Hickson died from complications accompanying meningitis and meningococcemia, diseases which affect membranes surrounding the brain and spinal cord. His mother took him to two hospitals in Terrell, but the child received no therapeutic treatment until he was transferred to Children's Medical Center in Dallas. Contending that their son would not have died if he had received proper medical treatment in Terrell, his parents, Larry and Kanako Hickson, sued the doctors, hospitals and ambulance service that attended the child before he arrived at Children's Medical Center. A jury trial resulted in a judgment that the Hicksons take nothing from the defendants.

The Hicksons appeal, asserting twenty-four points of error attacking the trial court's charge, its ruling on evidence concerning the duty of the hospitals, and the jury's answers to the special issues. We agree that the jury's findings concerning Dr. Martinez and Professional Ambulance Service, Inc. were against the great weight and preponderance of the evidence. We also agree that the trial court erred when it excluded portions of the Code of Federal Regulations offered by the Hicksons to prove the standard of care the hospitals were required to observe. Accordingly, the trial court's judgment is reversed and the cause is remanded for a new trial.

## I. *Facts*

Two days before his death, Byron Hickson had a slight fever and some upper respiratory congestion. His parents thought these were symptoms of a cold. The child slept restlessly during that night. But when he awoke the next day, he told his father that he felt better. Byron played for awhile and then ate breakfast. However, he regurgitated his breakfast and suffered a grand mal seizure shortly before 10:00 a.m. The seizure rendered him partially unconscious. Assisted by a neighbor, his mother rushed him to the emergency room at Colonial Hospital.

Byron was first seen by a nurse in Colonial's emergency room. She initially noticed the unusual position that the child assumed when placed on the examining table: hands folded on his chest, legs outstretched and toes pointing downward. Next, she performed a quick "head-to-toe" visual assessment which revealed the presence of petechiae, a rash associated with blood-borne infections which is caused by the rupturing of capillaries just beneath the surface of the skin. The nurse also noticed that the pupil of one of the child's eyes was dilated while the other was constricted. Neither pupil reacted when she shined a light into the child's eyes. Next, the nurse took his pulse and determined that he had a one-hundred one degree temperature.

Although the nurse had never before seen these symptoms, she knew that the child was critically ill and called in the nearest physician, Dr. Martinez. Dr. Martinez briefly examined the child and determined that the child probably had a systemic blood infection. Although he also recognized that the child was extremely ill, he decided that, rather than attempting to treat an undiagnosed disease, he should refer Byron to a pediatrician.

On the order of Dr. Martinez, the nurse called the office of Dr. Vasani, a pediatrician, at approximately 10:30 a.m. With Dr. Martinez present, she described the child's symptoms to an unidentified person who told her that Dr. Vasani would see the patient at his office. According to the nurse, she again called Dr. Vasani, described the child's condition, and arranged for Dr. Vasani to see Byron at Terrell Community Hospital's emergency room.

Dr. Vasani testified that he never talked to the nurse. He stated that he received her message and unsuccessfully attempted to call Dr. Martinez. It is undisputed that Dr. Martinez never spoke directly to Dr. Vasani. However, the nurse claimed that Dr. Martinez was present when she placed both calls.

Dr. Martinez also asked that someone call Byron's grandmother, Glenna Hickson, because Byron's mother was unable to relate Byron's medical history due to a language barrier. Byron's mother is foreign-born and, apparently, does not speak English well. According to Glenna Hickson, she received a call at approximately 10:30 a.m. informing her that Byron was "gravely ill" and that she should come to Colonial Hospital's emergency room to pick up her grandson and daughter-in-law and take them to see a pediatrician. Glenna Hickson did not arrive at Colonial Hospital until thirty-five minutes after receiving this call. She explained that, although the hospital was only a five-minute drive from her home, she was ill that morning and was physically unable to leave immediately.

What transpired at the hospital between the time of the call to the grandmother and her arrival is unclear. Dr. Martinez testified that he was with Byron only for approximately fifteen minutes. When Glenna Hickson arrived, she found the nurse with Byron and his mother, but did not see Dr. Martinez. The nurse told her to take the child to the emergency room at Terrell Community Hospital where he would be seen by Dr. Vasani. Five to ten minutes later, the Hicksons arrived at Terrell Community Hospital. According to the records

of Terrell Community, Byron was admitted at 11:50 a.m., approximately two hours after the seizure and more than an hour after the phone call to the grandmother.

Witnesses recounted two versions of the events at Terrell Community Hospital. According to Glenna Hickson, no one at the hospital was expecting them. She stated that she and Kanako Hickson placed the child on an examination table and that Kanako had gone to call her husband when she was approached by Dr. Saunders, the emergency room physician. She stated that Dr. Saunders never saw Byron. Glenna Hickson further testified that, while they were waiting for medical attention, Byron stopped breathing and that she had to shake him to make him resume breathing. Then a nurse came in followed by Dr. Vasani. Glenna Hickson stated that they waited approximately ten minutes before Dr. Vasani arrived.

According to Dr. Saunders, he went in to see Byron and was just beginning his evaluation when Dr. Vasani arrived. He told the jury that he was only with the child a few minutes and that he left when Dr. Vasani arrived. Dr. Vasani testified that Dr. Saunders had stopped him as he was passing through the emergency room on his way to the hospital.

Dr. Vasani examined Byron and determined that he was suffering from increased intracranial pressure, which probably resulted from meningococcemia. According to Dr. Vasani, to verify his diagnosis it would have been necessary to tap the fluid surrounding the spinal cord and the brain. Dr. Vasani testified that, because he thought a spinal tap might cause the brain to herniate and, because none of Byron's vital functions were in immediate jeopardy, he decided to call Children's Medical Center in order to transfer Byron to where a neurosurgeon could tap fluid from the child's brain.

According to Dr. Vasani, he talked to Dr. Anas during this phone call and Dr. Anas recommended that he transfer the child. Dr. Vasani also testified that Dr. Anas told him not to administer antibiotics because

they would prevent the medical center's staff from being able to render a positive diagnosis. Dr. Anas did not recall this conversation and testified that, if fully informed of the child's condition, he would not have recommended withholding antibiotic treatment.

After this conversation, Dr. Vasani arranged to transport Byron to Children's Medical Center by ambulance. The ambulance arrived at Terrell Community at 12:05 p.m., only a few minutes after receiving the call from the hospital. Byron was already receiving oxygen. The emergency medical technicians transferred the child to a portable oxygen tank, loaded him in the ambulance and drove to Dallas. According to both technicians, Byron's vital signs were: pulse, 120; blood pressure, 60/40; respiration, moderately rapid and shallow. Both ambulance attendants testified that these vital signs did not change significantly during transit.

The ambulance arrived at Children's Medical Center at 12:50 p.m. and the ambulance crew took Byron directly to the emergency room where several staff members began working on him. According to the records of Children's Medical Center, Byron was admitted with agonal respirations, heart rate of 50, and blood pressure of 60/palpitation. This condition required immediate resuscitation. The personnel inserted an airway down the child's esophagus, started intravenous administration of fluids, and administered cardiac massage. After stabilizing the child, they diagnosed Byron as suffering from meningitis and meningoccemia and administered antibiotics. However, the diseases had already caused the brain to herniate. The next day, Byron's brain showed no electrical activity and, at the Hicksons' request, the doctors disconnected the child's artificial life support systems. Byron died immediately.

## II. *Action Against Dr. Martinez*

We shall first address the Hicksons' points of error attacking the take-nothing judgment as to Dr. Martinez. In response to one of the special issues, the jury answered that Dr. Martinez did not fail to properly diagnose the child's condition, to properly treat these diseases, or to properly stabilize his vital functions before allowing him to be transported. The Hicksons contend that these answers were contrary to the great weight and preponderance of the evidence. In deciding this point, we must consider all of the evidence to determine whether the jury's answers were manifestly wrong and unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *Martin v. United States Trust Co. of New York,* 690 S.W.2d 300, 306 (Tex. App.—Dallas 1985, writ ref'd n.r.e.); *see generally,* Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Texas L.Rev. 361 (1960); Garwood, *The Question of Insufficient Evidence on Appeal,* 30 Texas L.Rev. 803 (1952). Based on all the evidence, we conclude that the jury's negative answers were against the great weight and preponderance of the evidence.

Dr. Martinez testified that he could only determine that the child probably suffered from a systemic blood infection. It was undisputed that he was unable to diagnose this child's illness. Nor is it disputed that, because of his inability to render an accurate diagnosis, Dr. Martinez administered no treatment to the child. The evidence also conclusively shows that Dr. Martinez did nothing to stabilize the child's vital functions before allowing him to leave Colonial Hospital. In sum, Dr. Martinez simply did not know how to handle this situation and, therefore, decided to send his patient to someone whom he thought was better qualified.

If the special issues had inquired only whether Dr. Martinez failed to diagnose, treat, or stabilize his patient, we could only conclude that the jury's answers were based on some factor other than the evidence. However, the special issues inquired whether the doctor failed to *properly* diagnose, treat, or stabilize the patient

without defining proper diagnosis, treatment, or stabilization. The jury may have thought that the issue combined two questions; i.e., did Dr. Martinez fail to treat, diagnose and stabilize his patient and was such failure, if any, improper? Given this construction, which does not consider the fact that the negligence question was submitted separately, we shall address this point as though the jury found that Dr. Martinez failed to act but that such inaction was not improper.

■ Even under this analysis, we conclude that the jury's verdict was contrary to the great weight and preponderance of the evidence. Four experts testified that any reasonably prudent physician would have been able to determine from Byron's symptoms that he suffered from meningitis and meningococcemia. These experts further told the jury that any physician should have realized that the child needed immediate treatment and should have known to administer antibiotics. In rebuttal, Dr. Martinez pointed out that, because a complete medical history was not available, he did not know whether the child would suffer an allergic reaction to treatment with a penicillin derivative. However, the evidence established that the disease was the greater and more immediate hazard and that a physician of reasonable prudence would have administered the antibiotic treatment notwithstanding the risk of an allergic reaction. The only evidence that could have remotely supported the jury's answer was elicited from Dr. Martinez's expert witness, who testified that, under the circumstances, he did not think Dr. Martinez acted improperly when he transferred the patient. The jury disregarded the preponderance of the expert testimony when it answered that Dr. Martinez did not fail to properly diagnose or treat the child.

Concerning the failure to stabilize, the dispute centered on whether the child's condition *required* stabilization. The evidence showed that while Byron was Dr. Martinez's patient, his heart rate was just below the upper limits of normal and that he had no serious difficulty in breathing. His blood pressure was just above the lower limits of the normal range. However, this pressure was determined when Dr. Martinez took Byron's blood pressure with a cuff designed for adults rather than children, an error which caused the blood pressure reading to be unreliable. Although it was undisputed that Byron was not fully conscious, there was conflicting evidence concerning the severity of the coma.

■ According to expert witnesses, all of these factors must be considered when deciding whether to stabilize the patient by administering intravenous fluids to raise blood pressure and by inserting an airway to insure adequate ventilation. The Hickson's experts testified that Dr. Martinez should have taken both steps before allowing the child to leave the hospital. Dr. Martinez and his expert disagreed on the ground that the child did not need stabilization while under the doctor's care. Dr. Martinez and his expert also testified that if—as the Hicksons contended he should have done—Dr. Martinez had intubated the child, it could have caused the child to vomit and then choke. However, the evidence shows that other methods of assuring the child's airway were available. Moreover, the evidence established that the diseases with which Byron suffered developed quickly and could threaten vital bodily functions at any time. In light of this danger, the fact that Dr. Martinez could not otherwise treat this patient, and the fact that the delay in the grandmother's arrival allowed adequate time to initiate these procedures, we hold that if the jury's "no" was a finding that Dr. Martinez had no duty to stablize the child, this finding was contrary to the preponderance of the admitted evidence of what a reasonable, prudent physician would have done under the same or similar circumstances.

Because we must remand the cause against Dr. Martinez, we shall also address the Hicksons' contention that the trial

court erred when it used the locality rule to define "negligence," "ordinary care", and "proximate cause" in its charge to the jury. The Hicksons first argue that including the locality rule in the charge misstated Texas law because the supreme court has tacitly overruled this element of proof in medical malpractice cases. The Hicksons reason that in *Snow v. Bond*, 438 S.W.2d 549 (Tex.1969), *King v. Flamm*, 442 S.W.2d 679 (Tex.1969), *Webb v. Jorns*, 488 S.W.2d 407 (Tex.1972), and *Hood v. Phillips*, 554 S.W.2d 160 (Tex.1977), the court silently abandoned the locality rule by recognizing a minimum standard of care which physicians must observe regardless of the locale of the physician's practice, *Webb*, 488 S.W.2d at 411, and by stating that the question in every medical negligence case is whether the physician acted as a reasonable, prudent doctor would have acted under the *same or similar* circumstances. *See Hood*, 554 S.W.2d at 164–166; *King*, 442 S.W.2d at 681; *Snow*, 438 S.W.2d at 550–51.

We cannot agree that the locality rule is no longer applicable in Texas. The supreme court recently reiterated that, unless a different standard is imposed by statute, a plaintiff seeking to hold a physician liable for negligence at common law must still prove by expert testimony that the defendant failed to act as a reasonable and prudent physician practicing in the same or similar community would have acted. *See Peterson v. Shields*, 652 S.W.2d 929, 930 (Tex.1983). However, this statement is not an absolute mandate. Concerning the admissibility of expert testimony, the supreme court has stated:

> The community standard rule does not require a small office of a rural medical practitioner to possess either the skills or equipment of a sophisticated clinic; but the standard demands, at least, that one must exercise ordinary care commensurate with the equipment, skills and time

available. A trial court has discretion in the administration of the community standard. Any other treatment of the rule would mean that some communities would be measured by standards which fall beneath those universally regarded as ordinary medical standards.

*Webb v. Jorns*, 488 S.W.2d at 411.

In other words, subject to the trial court's discretion, expert testimony is admissible only if the expert testifies according to the standards of practice in the same or a similar community. Accordingly, we cannot agree that the supreme court has tacitly abandoned the locality rule in suits against a physician for negligence.

This is not to say, however, that the trial court, in its jury charge, should direct the jury to consider the locality in which the defendant practiced when deciding the negligence question. In our view, the locality rule is one of the predicates for admitting expert testimony and thus is a question of law, not fact. Theoretically,[1] *all* of the testimony concerning the applicable standard of care which the defendant should have observed will be based on the standard in the defendant's community or one similar thereto. Consequently, including the locality rule in the jury charge is unnecessary at best because under the rule in *Peterson* there would be evidence of no other standard than that which applies to the locality of the defendant's practice. Therefore, it is necessary to instruct the jury to determine *only* whether the defendant acted as a reasonable, prudent practitioner would have acted under the same or similar circumstances. *See Hood*, 554 S.W.2d at 165; *King,* 442 S.W.2d at 681; *Snow*, 438 S.W.2d at 550–51; *See also, e.g.*, 3 State Bar of Texas, Texas Pattern Jury Charges 40.01. It is the duty of the doctor's lawyer to insure by entering a timely objection that the evidence of what a reasonably prudent physician would have done

---

**1.** This assumes that counsel properly objects to any evidence that is not based on the minimum   standard of practice in the community.

is based on practices in the defendant's community.

Since we have already found that the jury's verdict was contrary to the great weight and preponderance of the evidence, we need not decide whether including a reference to the locality rule in the definitions of "negligence," "ordinary care" and "proximate cause" was harmful error. However, in a case such as this, where the plaintiffs' experts practice in an urban area, where the defendant's expert practices in a smaller community, and where throughout the trial defense counsel emphasized the difference between urban and rural medical practices, we think triplicate references to the locality rule could unduly emphasize a defensive theory and constitute a comment on the weight of the evidence. *See Acord v. General Motors,* 669 S.W.2d 111, 116 (Tex.1984); *Gulf Coast State Bank v. Emenhiser,* 562 S.W.2d 449, 453 (Tex.1978); *Jannette v. Deprez,* 701 S.W.2d 56 (Tex.App.—Dallas, 1985, no writ). Accordingly, in the event of another trial of this case, the trial court *should* carefully weight these factors before composing its jury charge.

### III. *Action Against the Hospitals*

The Hicksons next contend that the trial court's judgment as to Colonial Hospital, Terrell Community Hospital and American Medical International must be reversed because the trial court improperly excluded from evidence three documents concerning the hospitals' standard of care. We agree only insofar as the exclusion of a portion of the code of federal regulations is concerned.

The Hicksons tendered a photocopy of federal regulations concerning the standard of care which hospitals receiving Medicare and Medicaid funds must observe. The Hicksons originally tendered this document as if it were a business record and the trial court sustained the hospitals' objections that the document was not the best evidence. The Hicksons then elicited testimony that the copy was made from the bound volume and that the witness had ascertained that the copy was correct when compared with "the original." When the hospitals reurged their best evidence objections, the trial court excluded the document.

■ Generally, to prove the contents of a writing, a party is required to tender the original writing. Tex.R.Evid. 1002. However, a photocopy of an original is admissible to the same extent as the original unless its authenticity is questioned or its admission would be unfair. Tex.R.Evid. 1001(4), 1003. No question was raised concerning the authenticity of the photocopy and we perceive no unfairness in admitting it instead of an original.

However, one of the hospitals argues that the trial court correctly excluded the photocopy because it was not certified as correct under the procedures enumerated in evidence rule 902(4). This contention overlooks the alternative provided in rule 1005. "The contents of ... a document authorized to be recorded [which is] actually recorded ... may be proved by copy ... testified to be correct by a witness who has compared it to the original." Tex.R.Evid. 1005.

Counsel for one of the hospitals contended during oral argument that the original to which the witness compared the photocopy was itself a photocopy and not an "original" as defined by rule of evidence 1001(3). The record reflects, however, only the following testimony on this point:

[Plaintiff's Counsel]: And is the original document in a bound volume that is a policy of Parkland Hospital to maintain in its records and library?

[Witness]: Yes, it is, very extensive volume.

No one questioned the witness further concerning the nature of the original. Nothing in the witness's testimony would indicate that the reference document was a photocopy. Absent testimony to this effect, which could have been obtained by taking the witness on voir dire, the testimony before us satisfies rule 1005.

The hospitals also contend that the trial court cannot be reversed because the Hick-

sons attempted to offer the document as a business record. They argue that having sought to admit the document on that basis, the Hicksons cannot now complain that the the document was admissible on some other basis. The flaw in this argument is that it erroneously assumes that the document was hearsay which was inadmissible unless qualified under some exception to the hearsay rule.

■ The Code of Federal Regulations is not hearsay because it does not contain an assertion of fact that was offered to prove the truth of the matter asserted. *See* Tex. R.Evid. 801(d). Instead, the regulations are, in essence, a command. They need not be qualified under any exception to the rule against hearsay. Therefore, the trial court could not have properly excluded the regulations for failure to meet the business record exception contained in rule 803(6). Because the Hicksons established the admissibility of the regulations under rule 1005, the trial court erred when it excluded them.

Notwithstanding the hospitals' arguments, we find the exclusion harmful. The Hicksons first sought to establish that the hospitals were directly liable. However, the jury found that the hospitals did not commit any of the acts or omissions which formed the basis of the Hickson's direct liability claim. The Hicksons also claimed that the hospitals were vicariously liable for the negligence of their nurses under the doctrine of respondeat superior. While the jury found that the nurses failed to obtain an adequate medical history, it decided that this failure was not negligence. In other words, the jury did not think an ordinary, prudent nurse would have obtained an adequate medical history, and therefore these nurses did not violate a duty owed to the child.

■ However, the Code of Federal Regulations required hospitals receiving Medicare and Medicaid funds to keep adequate medical records on every emergency room patient. 42 C.F.R. 405.1033(d)(1). Among other things, an adequate record must con-

tain the patient's "[h]istory of disease or injury." 42 C.F.R. 405.1033(d)(1)(ii).

The evidence established that the hospitals accepted Medicare and Medicaid funds and therefore were subject to the duties imposed by these regulations. In light of the jury's finding of no duty to obtain an adequate medical history despite the opportunity to do so, we cannot say that excluding this evidence was harmless.

## IV. *Action Against the Ambulance Company.*

Next, we turn to the Hicksons' contention that the jury's answers to the special issues concerning the liability of the ambulance company conflicted with the great weight and preponderance of the evidence. This special issue inquired whether the ambulance company "accept[ed] care and treatment of Byron Glen Hickson when it was not qualified to do so," "fail[ed] to require ... appropriate or competent medical personnel accompany [the child] during transfer"; "fail[ed] to properly assess changes in the condition of [the child] during transfer"; and "fail[ed] to properly treat changes in the condition of [the child], if any, which occurred during transfer." Answering that the ambulance company committed none of these acts or omissions, the jury did not answer the associated inquiries on negligence and proximate cause.

We must again agree with the Hicksons insofar as their argument concerns the jury's finding that the ambulance company did not fail to require that qualified medical personnel accompany their son. The ambulance driver testified that he dealt with the logistical concerns of the transfer while his partner was attending the child. He testified that he did not require a doctor or nurse to accompany them because he had already asked if anyone would accompany them and had been informed that only the child's mother and grandmother were going. He explained that he saw no point in arguing because, based on the answer to his question, he assumed that Dr. Vasani had already decided that neither he nor a nurse was required.

■ The driver's testimony is the only evidence concerning whether the ambulance company "failed to require appropriate or competent medical personnel." Thus, the jury's answer that the ambulance company did not commit this omission is contrary to all of the evidence. Because the record contains some evidence that the ambulance company was under a duty to require a doctor or nurse and that this omission "contributed to" the child's death, we once again cannot say that the incorrect answer was harmless. Therefore, we must also reverse the trial court's judgment in favor of the ambulance company.

We could speculate that the jury may have entered its answer believing that "appropriate or competent medical personnel" referred to the emergency medical technicians who manned the ambulance rather than a doctor or nurse. However, both parties argue the point with the implicit understanding that "medical personnel" did not include the ambulance attendants, and the context of the special issue supports this understanding. Thus, we cannot construe the special issue to justify the jury's answer. The judgment of the trial court is reversed and the cause is remanded for a new trial.