Leighia HUTCHISON, Individually and as Representative of the Estates of Cody Edward Hutchison and Elizabeth Paige Hutchison and as Next Friend of Jonathan Thomas Hutchison, Laura Blevins, Donny C. Drennon, Randy Edward Hutchison, as Heir and Personal Representative to the Estates of Cody Edward Hutchison and Elizabeth Paige Hutchison, and Sharon Hutchison as Assignee, Appellants,

v.

Vincent PHARRIS d/b/a Murray & Massie Butane, Appellee.

No. 02–03–006–CV.

Court of Appeals of Texas, Fort Worth.

Jan. 6, 2005.

Rehearing Overruled Feb. 3, 2005.

Sydow, Kormanik, Carrigan & Eckerson, Michael Sydow, Houston, Whittenburg, Whittenburg, Schachter & Harris, P.C., Ana E. Estevez, Amarillo, for Appellants.

Byrne, Townsend, Mead & Smitherman, David Townsend, Joseph Byrne, Dallas, for appellee.

Panel B: CAYCE, C.J. and GARDNER, J.

## OPINION

ANNE GARDNER, Justice.

### INTRODUCTION

This suit involves the tragic deaths of two children resulting from a fire that also injured three adults and destroyed a mobile home. Appellants Leighia Hutchison, individually, as next friend of Jonathan Hutchison, and as representative of the estates of Cody and Elizabeth Hutchison; Laura Blevins; and Donny Drennon appeal from a take-nothing judgment in favor of Appellee Vincent Pharris d/b/a Murray & Massie Butane (Murray & Massie). Appellants raise three issues, complaining that (1) there is legally or factually insufficient evidence to support the jury's finding that Blevins and Hutchison were contributorily negligent in causing the fire or deaths; (2) the jury's failure to find negligence of Murray & Massie in connection with the mobile home's propane tank is against the overwhelming weight and preponderance of the evidence; and (3) the jury's failure to award damages to Appellants is against the overwhelming weight and preponderance of the evidence.[1]

### FACTUAL BACKGROUND

#### A. The Fire

At about 9:00 a.m. on March 9, 1994, a fire engulfed and totally destroyed a double-wide mobile home at Lake Arrowhead, Texas. Laura Blevins and her husband had bought the mobile home in 1992.

Laura and her husband had separated, and she had lived in the mobile home for a little more than a year at the time of the fire. The propane tank and line were already hooked up when they bought the trailer. Blevins did not know who had previously serviced the tank. When they first bought the mobile home, she had called John's Tractor & Propane to check and service the tank.

Murray & Massie first made an "out-of-gas" call to the residence on November 2, 1993. Its gas serviceman performed a monometer or "leak" test of the regulator, made a visual exam, reconnected the line, and went into the house and lit the pilot lights after filling the tank. Everything checked out. Murray & Massie again provided propane service and filled the tank on November 2, 1993, December 6, 1993, January 5, 1994, and January 21, 1994. When Murray & Massie was not paid for those last three deliveries, it quit delivering gas. When Blevins once again ran out of gas in March, shortly before the fire, she called Calvin Gas Company for service. Calvin Gas was the last dealer to fill Blevins's propane tank before the fire. Calvin Gas filled the tank a few days before the fire but did not inspect the system or light the pilot lights.[2]

At the time of the fire, the mobile home was occupied by Blevins, her son Donny, her daughter Leighia Hutchison, and Hutchison's three children. Cody was three years of age, Jonathan was eighteen months old, and Elizabeth was five months old. Blevins had turned on the burners of her kitchen stove to warm the home when she returned from work around 4:00 a.m.

---

1. Appellants and Intervenors Randy Edward Hutchison, as heir and personal representative of the Estates of Cody and Elizabeth, and Sharon Hutchison, as assignee, joined in this appeal and adopted in all respects the brief of the above-named Appellants.

2. Blevins first testified that she tried to call Murray & Massie but its office was closed for vacation. However, she admitted that she had not paid Murray & Massey for its latest three deliveries and still owed it money when she called Calvin Gas.

There was no other heat, as the pilot lights to the furnaces had been unlit for several days.

Blevins had coffee and a couple of cigarettes and left the burners on when she retired to her bedroom after heating a bottle for her granddaughter, Elizabeth. Leighia awoke and took the three children into another bedroom to watch TV after the two boys had cereal. Donny was asleep in the third bedroom. Leighia went back to sleep with Elizabeth lying beside her as Jonathan and Cody left the bedroom, ostensibly to use the bathroom, shutting the bedroom door behind them. No one smelled gas.

Blevins heard the boys go into the kitchen. A few minutes later, Leighia heard Cody scream. Blevins came out of her bedroom and saw what she would later describe as a "fireball" above the stove that "swooshed" back toward the laundry room, knocking her down. The boys ran to Blevins, who crawled with Jonathan through thick smoke and heat to the front door and onto the porch. Cody ran back toward the bedroom, and she never saw him again. According to Blevins, an unidentified man drove up to the scene with his wife, who took Jonathan to safety while the man held Blevins back from re-entering the mobile home to find the other two children.

Blevins's daughter, Leighia, testified that she awoke and opened the door to the hall, but it was filled with black smoke, so she went to the window and opened it, whereupon, she said, she was pulled through the window by Blevins and the same unidentified man, leaving five-month-old Elizabeth asleep next to the same window. Blevins's son, Donny, awoke and opened his door to smoke and flames, with

things falling down from the ceiling. He briefly saw Cody's legs through the smoke, and then someone called Cody, who ran back the other direction. Donny broke a window with a chair and crawled through it. He did not try to re-enter the home as every room was on fire. Both Cody and Elizabeth died in the fire.

## B. The Suit

Appellants originally sued the manufacturers of the mobile home and heating system and Calvin Gas Company for injuries suffered by the adults and wrongful death and survival actions for the deaths of Cody and Elizabeth. Other defendants, including Murray & Massie, were later added to the suit.[3] After several claims were settled, the case ultimately proceeded to trial in September 2002 against Murray & Massie as the sole remaining defendant.

Appellants' theory of liability against Murray & Massie at trial was that the propane tank's regulator, which was more than fifteen years old, had "worn out" and failed, resulting in increased pressure on the furnace control valve, which in turn allowed propane gas to leak into the home and to get ignited by the stove burners. Appellants claimed Murray & Massie was negligent and violated the DTPA in breaching a warranty to perform services in a workmanlike manner and in failing to replace the regulator or advise Blevins that the regulator was more than fifteen years old.

Following a week-long trial, the jury returned a verdict answering broad-form jury question number one "yes" as to whether negligence of Leighia Hutchison and Laura Blevins was a proximate cause of the occurrence in question, and "no" as

---

3. A summary judgment in favor of Murray & Massie was reversed and the cause was remanded as to it in *Hutchison, et al. v. Vincent Pharris d/b/a Murray & Massie Butane,* No. 2–99–347–CV (Tex.App.-Fort Worth June 14, 2001, pet. denied).

to whether negligence of the furnace manufacturer, Calvin Gas Co., or Murray & Massie was a proximate cause of the occurrence. In answer to jury question number two, the jury apportioned the percentage of causation attributable to Leighia Hutchison at 30 percent, the percentage attributable to Laura Blevins at 70 percent, and the percentage attributable to Murray & Massie and the other two named parties at zero.[4] The jury questions on damages were conditioned upon affirmative findings on the liability issues and, consequently, were not answered. Appellants appeal from a take-nothing judgment on the verdict after denial of their motion for new trial.

## C. The Expert Testimony

### 1. The Investigation

Kenny Lemons, a fire investigator certified by the State, was a deputy with the Clay County Sheriff's office. He arrived at the scene as firemen were extinguishing the blaze, and took charge of the scene after the fire was out to determine the origin and cause of the fire. His purpose was to find the approximate area of origin of the fire. He questioned people at the scene, including firemen, a neighbor, the local fire chief, and Leighia Hutchison. He did not interview Blevins, but another fireman told him that she had described hearing a "whoosh" or explosion. The overwhelming majority of the wiring was destroyed, according to Lemons, so that he was not able to examine it.

The furnace from the laundry room had ended up outside the home, upside down. Lemons testified that he flipped it over and put it back into place beside the washer in what had been the laundry room. He described the furnace as an old unit with rusted parts, and he understood that it was "inoperable" and that the family did not even use it. In Lemons's opinion, the fire's most likely origin was the furnace, and the cause was "some kind of gas leak" in the area of the laundry room, based on the high damage to the beams and appliances in that area. He testified that the source of the leak was probably the bottom of the furnace. Once he determined that the fire was "accidental," he did not investigate further in detail.

Lemons called David Duke, a lieutenant and fire and arson investigator with the Wichita Falls Fire Department, who arrived at about 11:00 a.m. and assisted Lemons in finding the older child's body and in determining the origin and cause of the fire. When Lieutenant Duke arrived, the little girl's body had already been recovered by another fireman in the front bedroom. The remaining child was found in the hallway outside another bedroom. Lieutenant Duke spent six and one-half hours at the scene, five hours of which were spent determining the origin and cause of the fire.

Witnesses had first seen the fire in the northwest corner of the trailer near the laundry room. Duke confirmed that the fire appeared to have burned longer and hotter in that area, which he explained was an indicator of the location of origin. He testified that the overwhelming majority of the wiring was destroyed, and he was unable to examine it. He was also unable to look at burn patterns or "vee" patterns

---

4. The jury answered "no" to jury question number three as to whether failure, if any, of Murray & Massie to replace the regulator was a failure to perform services in a good and workmanlike manner and a producing cause of the occurrence in question. Consequently, the jury did not reach question number four, inquiring whether such failure was committed knowingly. Appellants do not complain of the jury's failure to find in their favor on these issues.

because there was total destruction. The bottoms of the washer and dryer were heavily distorted. Duke and Lemons ruled out arson. Duke confirmed that both he and Lemons believed the cause was "some sort of gas leak" based on significant heating below the furnace. He believed that the bottom of the furnace ignited and was the seat of the fire. He agreed that, if a witness said a "fireball" came off the stove top and migrated back to the furnace, that would put the point of origin in the kitchen.

### 2. The Regulator

Michael Chaney, an independent certified fire investigator hired by Appellants, and Robert Ross, an expert consulting engineer, testified for Appellants about the purpose and function of the regulator on the propane tank. They explained that a propane tank has gas under pressure from 20 to 40 pounds per square inch (psi), depending on the temperature. The maximum pressure on the furnace control valve is specified by the furnace manufacturer at 14 inches "water column," which equates to ½ psi. The manufacturer's brochure warns that the control valve could be damaged if the pressure exceeds the range of 11 to 14 inches. Ross testified that, if the control valve is over-pressured beyond 6 or 7 psi, the furnace control valve will at some point leak gas. The only protection from pressure on the valve is the regulator on the tank. The regulator keeps the pressure at a safe level. The regulator on this tank was manufactured by Fisher, date stamped as manufactured "10–73." It was undisputed that the fire occurred twenty-one years after the regulator was manufactured.

Ross described Fisher's warnings in its manuals, including the risk of fire and explosion from old, unmaintained regulators. Since the 1970's, he said, Fisher had issued materials to trade publications and dealer letters concerning the need to maintain regulators on tanks. In 1989, Fisher issued stronger warnings recommending replacement of regulators that were more than fifteen years old. A large insurer of propane dealers had likewise issued recommended standards for its insureds, recommending replacement of regulators over fifteen years old if they were exposed to elements or showed signs of deterioration.

Ross testified that these recommendations were made because the "seat" of the regulator will wear out and become subject to producing higher pressures. The seat is made of synthetic rubber that needs to be pliable, and it will become brittle with age, allowing debris, such as scale from the tank or piping, to enter the regulator and cause it to malfunction, permitting gas to enter the home. However, he additionally testified that a blocked vent from insects or freezing precipitation may also cause a regulator to fail if the vent is not either protected by a bonnet or hood or turned to face downward.

### 3. Standard of Care

Ross testified for Appellants on the standard of care of a reasonable propane dealer in servicing a propane tank. He testified that, for out-of-gas calls, the National Fire Protection Association promulgated the "NFPA–54" procedure requiring a dealer to shut off the system, check the appliance, pressure check, and only do business with a customer if the propane system complies. However, he acknowledged that The Texas Railroad Commission regulates propane gas dealers in Texas. NFPA–54 was not adopted in Texas by the Railroad Commission until after 1993, according to Ross, and yet Murray & Massie not only complied with but exceeded the NFPA–54 procedure when it serviced Blevins's tank. He knew of nothing Murray & Massie did that was a violation

of any then-existing regulation of the Railroad Commission. However, he said, Calvin Gas had not complied with NFPA–54 and should have made sure that the pilots were on and checked the pressure when they serviced the tank shortly before the fire, but they had refused. In Ross's opinion, Calvin Gas was negligent.

Nevertheless, in Ross's opinion, Murray & Massey should also have changed out the regulator because it was more than fifteen years old in 1993, and Murray & Massie was thus negligent, as was Calvin Gas. Ross further testified that the regulator, as shown in a photograph of the tank and system taken three years after the fire, had no bonnet or hood and had therefore been "exposed to the elements." Additionally, the vent was not turned to point down, so that in his opinion, the vent was probably also blocked by freezing rain or insects. In his opinion, each dealer had some "blame."

Vincent Pharris, owner of Murray & Massie, had been in the business of propane gas service since 1966 and was licensed by the Railroad Commission as a dealer in 1968. Pharris testified he knows and complies with the standard of care for reasonably prudent propane dealers in Texas. He replaces several hundred regulators a year, making a profit from those sold, but also giving regulators to customers when needed. Pharris testified a reasonably prudent propane dealer would not necessarily change out a regulator that was over fifteen years old; replacement is not mandatory and the Railroad Commission does not require it. He would test it, and replacement would be "automatic" if the pressure went over 14 inches and would not adjust down or would creep back up. In that case, he would recommend that the customer permit him to replace it and would refuse to service the system and report the customer to the

Railroad Commission if he/she refused permission.

Pharris further testified he was not a Fisher dealer in 1993 and did not receive their dealer materials, but that he serviced tanks with Fisher regulators and knew Fisher recommended replacement of regulators more than fifteen years old. He also testified he told customers of Fisher's recommendations and, if a gas deliveryman did not tell a customer of the manufacturer's recommendation, in his opinion, it would have been "less than what he would expect." Murray & Massie stipulated that its gas deliveryman did not advise Blevins of Fisher's recommendation. Pharris testified he personally had not been out to the Blevins mobile home and he had not known the age of the regulator. However, the morning after the fire, Pharris said, he went to the scene and examined the regulator on the propane tank. It had a bonnet protecting it and good paint still on it. In his opinion, the regulator had not been exposed to the elements. The gas serviceman who had first serviced the tank for Murray & Massie testified that he always looked for any deterioration or damage, and if a regulator did not have a hood or bonnet, he would put one on.

James Peterson, a forensic mechanical engineer hired by the defense, testified that, in his opinion, Murray & Massie acted as a reasonably prudent propane gas dealer under the standards required in Texas. By complying with the NFPA–54 standard for leak-checking on out-of-gas calls, which had not yet been adopted in Texas at that time, he agreed with Ross, Murray & Massie exceeded the then-existing Texas standard. Peterson understood Murray & Massie's gas deliveryman obtained a pressure reading of 11 inches when he serviced the tank in 1993, and in his opinion, the regulator never showed aberrant pressure.

Peterson testified that he sits on National Propane Gas Association committees involved with technical standards and safety, and those committees have never adopted or recommended replacement after fifteen years as a standard. He had also worked for one of the companies involved in establishing the fifteen-year recommendation. Peterson described the fifteen-year recommendation as merely a "consensus" number for replacement if a dealer had not been regularly doing leak checks or maintaining the system. It was not a safety standard adopted by the industry.

## ANALYSIS

Jury question number one asked the jury: "Did the negligence, if any, of those named below, proximately cause the occurrence in question?" Below the question was a series of pattern jury charge definitions for "negligence," "ordinary care" and "proximate cause," followed by the instruction: Answer "Yes" or "No" for each of the following: "a. Leighia Hutchison; b. Laura Blevins; c. Evcon d/b/a The Coleman Company, Inc.; d. Calvin Gas Co., Inc.; e. Murray & Massie Butane." To the right of each name listed was a blank in which the jury wrote "yes" for Leighia Hutchison and Laura Blevins, and "no" for Murray & Massie and the other two named companies. Jury question number two inquired as to the percentage of responsibility of the same parties. These jury questions were standard broad-form, pattern jury form questions that submitted

both negligence and proximate cause, together with contributory negligence of Leighia Hutchison and Laura Blevins in the same question.[5]

### A. Contributory Negligence Finding

Appellants complain by their first issue that there is legally or factually insufficient evidence to support the jury's findings in answer to jury question number one and two that any negligence of Leighia Hutchison or Laura Blevins caused the fire or the deaths of Elizabeth and Cody. Specifically, Appellants argue that only fire investigators certified by the Texas Commission on Fire Protection are authorized to determine the cause and origin of fires.[6] Appellants contend that, of the four certified fire investigators who testified, two attributed the cause of the fire to a gas leak near the laundry room and the fourth, who testified on behalf of Murray & Massie, was of the opinion that the fire should have been categorized as "undetermined." Appellants argue that there is no evidence or factually insufficient evidence that Blevins and Hutchison were negligent because no witness testified as to any negligence on their part, and the fire rapidly spread and totally destroyed the mobile home in fifteen to twenty minutes, during which time the adults would likely have been disoriented while attempting to escape. Appellants further argue that no expert testified that the fire was caused by Blevins or Hutchison.[7]

5. See Comm. On Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges—General Negligence & Intentional Personal Torts PJC 4.1, 4.3 (2003).

6. Appellants contend that the minimum standards for fire investigation personnel are established by the Texas Commission on Fire Protection. See Tex. Gov't Code Ann. § 419.025 (Vernon 1998). As promulgated by that Commission, the current minimum standards require an individual to be certified as a fire investigator by the State to determine the cause and origin of fires. Texas Comm'n on Fire Protection, Standards Manual for Fire Protection Personnel § 431.201(d), http://www.tcfp.state.tx.us/standards/standards—manual/print—rule.asp?rule=431.201.

7. As Murray & Massie points out, the jury was asked whether Blevins or Hutchison's negligence, if any, proximately caused the "occurrence," not the "fire." Moreover, the jury

## 1. Waiver

Murray & Massie first argues that Appellants waived their complaint as to the negligence or causation findings against Blevins and Hutchison by failing to object to the submission of those issues. We disagree. "A claim that the evidence was legally or factually insufficient to warrant the submission of any question may be made for the first time after verdict...." TEX.R. CIV. P. 279. It is well settled that an attack based on legal sufficiency of evidence to support a jury finding may be preserved for appeal in any of five ways: (1) objection to the charge; (2) motion for directed verdict; (3) motion to disregard the finding; (4) motion for judgment notwithstanding the verdict; or (5) motion for new trial. *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991). Indeed, a complaint of factual insufficiency of evidence not only may but must be made only after verdict by a motion for new trial to preserve error for appeal in a jury case. TEX.R. CIV. P. 324(b)(2). Appellants properly preserved error both as to legal and factual sufficiency of the evidence by raising those complaints after verdict in their motion for new trial.[8] However, we conclude that any error in the jury's finding of contributory negligence is harmless as discussed below.

## 2. Harmless Error

Appellants complain in their second issue that the jury's finding of no negligence on the part of Murray & Massie is against the overwhelming weight and preponderance of the evidence. However, we likewise conclude that any error in this finding is harmless. We are persuaded by Murray & Massie's harmless error argument that the jury's refusal to find proximate cause as to any negligence on their part is sufficient to support the judgment. *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743 (Tex.1980).

Whether Blevins and Hutchison were contributory negligent was submitted in jury question number one along with whether Murray & Massie was negligent, and the same question also inquired as to whether the negligence, if any, of those parties was a *proximate cause* of the occurrence. The jury's answer of "no" as to Murray & Massie could have been based upon the jury's refusal to find either that Murray & Massie was negligent or that any such negligence was *a proximate cause of the occurrence.* Additionally, the jury attributed "0" percentage of causation to Murray & Massie in answer to question number two. It is unnecessary to address the legal or factual sufficiency of evidence to support the jury's findings of negligence of Blevins and Hutchison or the jury's failure to find Murray & Massie negligent if we hold that Appellants failed to challenge the negative finding as to proximate cause or that the finding is supported by the evidence. *Id.* at 750; *see* TEX.R.APP. P. 44.1(a)(1) (reversal precluded unless error complained of probably resulted in an improper judgment).

sent out a question asking for a definition of " 'occurrence?' as it relates to negligence? (in question # 1) fire deaths or ——?" The court instructed the jury: "... you are advised that 'occurrence' in Question # 1 is the *event, the deaths or the injury, if any."* (emphasis added). Therefore, it is clear from the record that the jury did not find that any negligence of Blevins and Hutchison caused the fire.

8. Asserting the legal sufficiency complaint only in their motion for new trial entitles Appellants only to a remand, rather than rendition, if sustained. *See In re W.E.C.*, 110 S.W.3d 231, 237 n. 3 (Tex.App.-Fort Worth 2003, no pet.) (citing *Horrocks v. Tex. Dep't of Transp.*, 852 S.W.2d 498, 499 (Tex.1993)).

■ Appellants respond that an erroneous finding is harmless only if answers to "other" jury questions support the judgment whereas here, there were no findings of negligence and proximate cause in answer to "other" questions because those elements, along with contributory negligence, were all submitted in the same jury question. But the harmless error rule applies in cases such as this, where a broad-form jury question encompasses both the complained of finding and the other unchallenged findings. *See, e.g., McRae v. Echols,* 8 S.W.3d 797, 801 (Tex.App.-Waco 2000, pet. denied) (jury's negative answer to broad-form submission of negligence and proximate cause in same question could have been based on finding that defendant's negligence was not a proximate cause of collision); *Carr v. Jaffe Aircraft Corp.,* 884 S.W.2d 797, 799 (Tex.App.-San Antonio 1994, no writ) (negative answer to question asking whether negligence of defendant proximately caused occurrence in question could have been based on failure to find either negligence or proximate cause); *Yap v. ANR Freight Sys., Inc.,* 789 S.W.2d 424, 428 (Tex.App.-Houston [1st Dist.] 1990, no writ) (negative finding that defendant's negligence was not a proximate cause could have been

based on jury's belief that any negligence was not a cause of event).

Appellants did not raise any issue in their original brief complaining of the jury's refusal to find proximate cause as to any negligence of Murray & Massie.[9] Absent such a complaint, the jury's refusal to find proximate cause is sufficient to support the judgment, regardless of the contributory negligence finding and regardless of whether the jury properly failed to find Murray & Massie negligent. *See Boatland,* 609 S.W.2d at 750; *Daves v. Comm'n for Lawyer Discipline,* 952 S.W.2d 573, 580 (Tex.App.-Amarillo 1997, pet. denied) (alleged error held harmless when jury's findings as to other issues are sufficient to support judgment); *Harris v. Gen. Motors, Corp.,* 924 S.W.2d 187, 188 (Tex.App.-San Antonio 1996, writ denied) (failure to challenge no-damages finding rendered any error regarding liability findings harmless).[10]

■ Although Appellants did not explicitly complain of the jury's refusal to find proximate cause in their original brief, Murray & Massie raised and fully argued the evidence in their response to show that the jury's finding of causation is not

9. Appellants did not object to the charge, and do not complain on appeal, as to submission of jury question number one in broad form because one element or theory submitted lacked evidentiary support. Therefore, we express no opinion as to whether this submission may have prevented proper presentation on appeal by improperly commingling theories, elements, or defenses lacking legal (or factual) evidentiary support. *See Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 390 (Tex. 2000) (reversing judgment based on answer to jury question improperly combining valid and invalid theories where timely and proper objection was made); *see also Harris County v. Smith,* 96 S.W.3d 230, 233 (Tex.2002) (holding error in submitting damage question combining some elements supported by legally insufficient evidence was reversible where

proper objection was made to broad-form submission).

10. *See also Schneider v. Schneider,* No. 2–02–075–CV, 2004 WL 254247, at *2 (Tex.App.-Fort Worth Feb. 12, 2004, pet. struck)(not designated for publication) (no-evidence complaint as to ground for divorce based on abandonment harmless where other unchallenged grounds supported judgment); *Tollen v. Benson,* No. 08–01–00006–CV, 2002 WL 244823, at *3 (Tex.App.-El Paso Feb. 21, 2002, pet. denied) (not designated for publication) (any error in submission of comparative negligence of plaintiff and finding of 100 percent responsibility harmless absent challenge to jury's negative answer regarding defendant's negligence or proximate cause).

against the overwhelming weight and preponderance of the evidence. Appellants, in turn, addressed this evidentiary issue in their reply brief. Ordinarily, an issue raised for the first time on appeal in a reply brief is waived.[11] However, the parties joined issue when Murray & Massie fully argued the evidence supporting the negative finding to proximate cause in its response brief and Appellants replied. Therefore, we will consider and address the issue as properly before us.[12] If the jury's refusal to find proximate cause as to any negligence of Murray & Massie is not against the overwhelming weight and preponderance of the evidence, then that negative finding is sufficient to support the judgment.

## B. Proximate Cause

■■■ The elements of a negligence cause of action are a legal duty, a breach of that duty, and damages proximately caused by the breach. *IHS Cedars Treatment Center of Desoto, Texas, Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex.2004) (citing *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex.2002)). To establish proximate cause, it is a plaintiff's burden to prove two elements, cause-in-fact and foreseeability. *Id.* Cause-in-fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred. *Id.* at 799; *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex.1991). The jury's negative answer to jury question number one as to Murray & Massie represented a

refusal to find from a preponderance of the evidence that negligence of Murray & Massie was a proximate cause of the occurrence. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989).

### 1. Standard of Review

When a party challenges the factual sufficiency of evidence regarding a refusal to find on an issue upon which that party bore the burden of proof, the party must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); W. Wendell Hall, *Standards of Review in Texas*, 29 St. Mary's L.J. 351, 484 (2002). We examine the entire record, first examining whether there is some evidence in favor of the challenged finding and, if so, whether the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust. *Dow*, 46 S.W.3d at 241; *Cain*, 709 S.W.2d at 176. Because the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, we may not substitute our judgment for that of the jury simply because we may disagree with its findings. *Herbert v. Herbert*, 754 S.W.2d 141, 142 (Tex.1988); *Jones v. Lurie*, 32 S.W.3d 737, 740–41 (Tex.App.-Houston [14th Dist.] 2000, no pet.). We may not reverse simply because we conclude that the evidence "preponderates toward" an affirmative answer. *Herbert*, 754 S.W.2d at 144. We

**11.** *Bankhead v. Maddox*, 135 S.W.3d 162, 163–64 (Tex.App.-Tyler 2004, no pet.) (citing *Anderson Producing Inc. v. Koch Oil Co.*, 929 S.W.2d 416, 424 (Tex.1996)); *Barnes v. SWS Fin. Servs., Inc.*, 97 S.W.3d 759, 765 (Tex. App.-Dallas 2003, no pet.); *JHC Ventures, L.P. v. Fast Trucking, Inc.*, 94 S.W.3d 762, 773, n. 9 (Tex.App.-San Antonio 2002, no pet.); *see also Penley v. Westbrook*, 146 S.W.3d 220, 226

(Tex.App.-Fort Worth, 2004, pet. filed); Tex. R.App. P. 38.1, 38.3.

**12.** *See Carone v. Retamco Operating, Inc.*, 138 S.W.3d 1, 7–8 (Tex.App.-San Antonio 2004, pet. denied) (considering issue as properly presented where fully briefed and responded to by both parties, citing *McKelvy v. Barber*, 381 S.W.2d 59, 62 (Tex.1964)).

may reverse only when the "great weight" of the evidence supports an affirmative answer. *Id.*

## 2. Causation Evidence

■ Appellants contend that the fire investigators certified by the State each testified that the fire originated at the furnace control valve. We agree that four expert witnesses testified who were certified as fire investigators, but we disagree with Appellants' characterization of their testimony.[13] Appellants argue that Deputy Kenneth Lemons and Lieutenant David Duke both testified the fire was caused by a propane leak at the furnace control valve. But neither Duke nor Lemons mentioned the furnace control valve. Appellants' expert, Michael Chaney, was also a certified fire investigator, formerly with the Wichita Falls Fire Department. Chaney reviewed Lemons's and Duke's reports, did his own investigation of the scene of the fire, which still stood unchanged after two years, and examined the materials in storage and the depositions of witnesses and reports of other experts. Chaney agreed with Lemons and Duke that the cause of the fire may have been a gas leak in the laundry room. He understood that there were open flames in the kitchen and that a witness saw a "fireball." He placed the origin of the fire at the stove. He theorized that the heated air in a cold room would draw the gas to the stove, where it ignited and then shot back toward the source. Chaney also explained that the gas had mercaptan added to provide a very "stinky" odor, but testified that the adults may not have smelled it if they were in other rooms and the leak developed suddenly.

Of the four certified fire investigators who testified, only Michael Chaney ad-

dressed any potential role of the furnace control valve. While he reviewed another expert's opinion that the "cock" in the control valve was the "weak link," he did not know where the control valve was, could not say how the control valve failed, and would defer to another expert on that subject. And failure of the control valve was not in issue as to any liability of Murray & Massie, in any event.

More importantly, Chaney addressed the role of the regulator on the propane gas tank, which was the specific basis for Appellants' theory of negligence against Murray & Massie. In his opinion, the probable cause of the fire was leaking gas from some point of ignition in the home. In his further opinion, the most likely cause of the leak was that the Fisher regulator that was outside the age of replacement had failed, allowing high pressure to come out of the tank, and then the control valve had failed, so that gas leaked inside the home.

However, Chaney acknowledged that he is not a regulator expert. He stated that Appellants hired a different expert to test the regulator, and he would defer to another witness who would talk about the regulator. He did not know how the regulator would have failed. There could be a number of reasons. He would stay out of areas of testimony about problems with the regulator.

The fourth certified fire investigator who testified was Murray & Massie's expert, Jean McDowell. McDowell is a forensic engineer and a Fellow in the Academy of Forensic Science and serves on the LP Gas Advisory Commission to the Texas Railroad Commission, advising it on standards and safety regarding liquid propane gas. He visited the site of the fire in 1995,

---

**13.** Robert Ross, Appellants' own standard of care expert, noted that neither Duke nor Lem-

ons reported that the leak originated in the furnace control valve.

and assisted in collecting, tagging, and storing evidence. If a gas leak coupled with the stove as the source of the ignition caused the fire, as theorized by Appellants, in his opinion there would have been an explosion, but he found no evidence of an explosion at the site. However, there was not enough evidence left from the fire to determine the origin and cause of the fire, in his opinion. There was not enough wire left to determine whether it was electrical, nor could he determine whether the fire might have started in the kitchen. The fire itself had destroyed the evidence. In McDowell's opinion, the origin and cause of the fire should have been classified as "undetermined."

Appellants seem to argue that only certified fire investigators are qualified to express opinions on the cause and origin of fires. But the closest that two of the certified fire investigators, Lemons and Duke, came to identifying the cause of the fire as being connected with the regulator was in expressing the opinion that it was some kind of gas leak originating in the area of the furnace in the laundry room. The third certified fire investigator, Chaney, acknowledged he was not qualified to commit to a professional opinion regarding the control valve or regulator. The fourth, McDowell, was of the opinion that the cause could not be determined from the evidence. We are aware of no case law holding that only fire investigators certified by the State of Texas may testify regarding the cause and origin of a fire. Moreover, Appellants do not claim that those experts' testimony overwhelmingly established that the regulator was a cause-in-fact of the fire.

Other experts specifically testified about the regulator and Murray & Massie's role. Robert Ross, Appellants' standard of care expert, testified for Appellants that, in his opinion, the probable cause of the leak and fire was that the regulator malfunctioned because of a blocked vent exposed to freezing rain and insects and facing the wrong way, and because the regulator was old and the seat had become brittle, allowing gas to leak into the home. However, Ross never tested the regulator. Ross acknowledged that, when the regulator in question was tested three years after the fire, it never delivered enough pressure to cause any damage to the control valve or house.

Murray & Massie presented two experts whose testimony directly controverted Appellants' liability theory. James Peterson, a licensed professional engineer, had worked for Fisher and other manufacturers in design and management and was familiar with regulators for propane tanks and regulator-related incidents. Peterson analyzed the regulator in question for the defense and reviewed the depositions and reports of the other experts. Peterson explained how the Fisher 922 regulator worked and described possible causes of failure, none of which occurred here, in his opinion. Peterson testified as to tests he performed on the regulator:

Q. Mr. Peterson, I'm going to show you Exhibit 1. Would you take a look at that and tell me what that exhibit depicts?

A. Oh, yes. Those are what I would call my field notes when we were conducting the tests at Mr. Dunn's office.

Q. And do they indicate what pressures you were able to obtain?

A. Yes.

* * *

Q. What's the significance of the pressures you found?

A. Those pressures are slightly higher than what the factory would have set them at. They're not abnormally high. They're slightly high, but nothing that should cause any damage to any downstream components.

Peterson further testified, based upon his examination of the regulator, that it was generally in good condition. In his opinion, the regulator was not a cause of the fire. Additionally, as we have noted, Jean McDowell testified the destruction of evidence at the scene was so great that it precluded any definitive conclusion as to the cause and origin of the fire. And as Appellee points out, McDowell also provided testimony that disputed Appellants' theory of a flash fire that created a "fireball" as described by Laura Blevins, which formed the basis for their theory that gas accumulated and ignited over the stove. McDowell testified he was unable to replicate such an explosion when he properly vented the mock-up of the trailer for his tests. He further testified:

A. [W]hen the mother woke up ... [,] she said her light didn't work. Also, when the door was opened, there was just black smoke. Those two things are not indicative of a flash fire.

Q. Why is that?

A. Well, a flash fire is just that, a very short-term fire that does not have sufficient longevity to ignite solid combustibles.... But when you've got an electrical system damaged, this is a fire that has penetrated into the structural members of the frame.... I don't know if it ran through the wall or through the ceiling to get to the other end of the trailer. But I think the reason the light didn't work, it's more likely than not the fire had already interrupted the circuit.

Appellants urge that this case is like *Hickson v. Martinez,* 707 S.W.2d 919 (Tex. App.-Dallas 1985), *writ ref'd n.r.e.,* 716 S.W.2d 499 (Tex.1986), in which the Dallas Court of Appeals held that a jury finding that the defendant doctor did not fail to properly diagnose, treat, or stabilize the patient was contrary to the overwhelming weight of the evidence. *Id.* at 924. In *Hickson,* four medical experts testified that in their opinions the defendant doctor acted contrary to a reasonably prudent physician and the only defense expert testified that he did not think the defendant doctor acted improperly in transferring the patient to another hospital. *Id.* Unlike the testimony of the defense expert in that case, the defense experts' opinions here went to the heart of Appellants' claim of negligence against Murray & Massie that depended upon the regulator being a cause of the fire. Peterson's testimony directly contradicted Appellants' experts' opinions that failure, malfunction, or age of the regulator was the cause of the fire, as well as their theory that the fire was a flash fire from ignition of gas that consumed the home in minutes. Murray & Massie's regulator experts countered their own experts' opinions that a fifteen-year old regulator represented a hazard and needed to be replaced as well as whether the regulator was a cause of the fire.

 Like many medical malpractice suits, this case comes down to a "battle of the experts." *See Cruz ex. rel. Cruz v. Paso Del Norte Health Found.,* 44 S.W.3d 622, 646 (Tex.App.-El Paso 2001, pet. denied) (holding refusal to find nurse negligent not against overwhelming weight of evidence where opinions of experts for both parties conflicted); *see also Magee v. Ulery,* 993 S.W.2d 332, 336 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (holding failure to find physician negligent not against overwhelming weight where jury could have believed defense expert that diagnosis was erroneous but not negligent); *Crawford v. Hope,* 898 S.W.2d 937, 942–43 (Tex.App.-Amarillo 1995, writ denied) (noting "battle of experts" existed in suit against physician for prescribing ineffective medication; weight of evidence was for jury and failure to find proximate cause not manifestly unjust or clearly erro-

neous). In a "battle of competing evidence," it is the sole prerogative of the jury to determine the weight and credibility of the witnesses, the obligation of the respective advocates to persuade them, and "our obligation to see that the process was fair and carried out according to the rules." *Cruz*, 44 S.W.3d at 646. We cannot substitute our judgment for that of the jury simply because we may disagree with the jury's findings. *Jones*, 32 S.W.3d at 743 (citing *Herbert*, 754 S.W.2d at 142). As fact finder, the jury is authorized to disbelieve expert witnesses. *See Waltrip v. Bilbon Corp.*, 38 S.W.3d 873, 882 (Tex. App.-Beaumont 2001, pet. denied). Here, the jury believed Murray & Massie's experts that the regulator did not cause the fire, rather than the experts offered by Appellants. We are unable to conclude that the jury's refusal to find that any negligence of Murray & Massie was a proximate cause of the occurrence was against the overwhelming weight and preponderance of the evidence.

## CONCLUSION

The jury's negative answer to jury question number one could have been based upon a refusal to find that any negligence of Murray & Massie was a proximate cause of the fire and the injuries and deaths for which Appellants sued. The additional finding that the percentage of causation attributable to Murray & Massie was "0" demonstrates that is exactly what the jury refused to find. The negative answer is not so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust and is sufficient to support the judgment. Therefore, even if the evidence is legally or factually insufficient to support the finding that Blevins and Hutchison were contributorily negligent, any error is harmless, and we accordingly overrule Appellants' first issue. Likewise, any refusal to find that Murray & Massie was negligent, even if contrary to the overwhelming weight of the evidence, is harmless. We thus overrule Appellants' second issue. And because the jury's refusal to find proximate cause supports the take-nothing judgment, it is unnecessary to reach Appellants' third issue complaining that the jury's failure to award damages to Appellants is against the overwhelming weight and preponderance of evidence. Tex. R.App. P. 47.1. We affirm the judgment of the trial court.