**Opinion issued December 6, 2012**



In The

# Court of Appeals

For The

# First District of Texas

————————————————

**NO. 01-10-00362-CV**

————————————————

**HIGHLAND CAPITAL MANAGEMENT, L.P., ML CBO IV (CAYMAN) LTD., PAMCO CAYMAN, LTD., PAM CAPITAL FUNDING, L.P., FAMCO VALUE INCOME PARTNERS, L.P., AND FAMCO OFFSHORE, LTD.,** Appellants

**V.**

**RYDER SCOTT COMPANY AND CHESAPEAKE ENERGY CORPORATION,** Appellees

---

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Case No. 2003-39194**

---

## OPINION ON REHEARING

We originally issued our opinion in this appeal on April 5, 2012. Appellee Ryder Scott Company has filed a motion for rehearing. We grant the motion for rehearing, vacate our earlier judgment, withdraw our previous opinion, and issue this opinion in its place.

In this securities case, appellants, Highland Capital Management, L.P.; ML CBO IV (Cayman) Ltd.; Pamco Cayman, Ltd.; Pam Capital Funding, L.P.; Famco Value Income Partners, L.P.; and Famco Offshore Ltd., sued appellees, Ryder Scott Company and Chesapeake Energy Corporation. Appellants asserted civil violations of the Texas Securities Act and made claims of fraud, negligent misrepresentation, conspiracy, and aiding and abetting fraud against appellees.

Ultimately, the trial court granted appellees' motions for summary judgment and sustained a number of their special exceptions, resulting in a final judgment in favor of Ryder Scott and Chesapeake Energy on all of appellants' claims. Identifying seven issues, appellants now challenge the trial court's judgment.

We affirm, in part, reverse, in part, and remand for further proceedings.

### Background Summary

Seven Seas Petroleum, Inc. was an oil and gas exploration company. In 1996, Seven Seas was exploring and developing oil and gas properties in

Colombia. Seven Seas operated a significant working interest in the Guaduas Oil Field, located northeast of Bogata.

Seven Seas began trading on the American Stock Exchange. Rule 4-10(a) of Regulation S-X of the Securities Exchange Act of 1934 ("Regulation S-X") required that, for it to issue a federally registered security, Seven Seas had to disclose the value of its oil and gas reserves in its SEC filings.[1] Regulation S-X prescribed the financial accounting and reporting standards that Seven Seas was required to apply. Among these standards, the company could report, as "proved reserves," only those oil and gas quantities that "geological and engineering data demonstrate[d] with reasonable certainty to be recoverable in future years."[2]

Seven Seas hired Ryder Scott Company, a petroleum engineering firm, which analyzes reserve data and estimates reservoir volumes, future production, and income attributable to reserve assets in accordance with SEC rules and regulations. Seven Seas retained Ryder Scott to provide such valuations, including proved reserve estimates, for the Guaduas Field.

In 1997, Ryder Scott prepared its first reserve report in which it estimated net proved reserves for the Guaduas Field to be 32.16 million barrels. The reserve report indicated that it had been prepared in accordance with SEC parameters.

---

[1]  *See* 17 C.F.R. § 210.4-10(a)(2).

[2]  *See id.*

In 1998, Seven Seas issued $110 million in "senior notes," which could be sold and traded on the public markets. Related to the issuance of the notes, Seven Seas filed a prospectus with the SEC. The filing expressly stated that the information contained in the prospectus, relating to oil and gas reserves, and the estimated future net revenues and cash flows attributable to the reserves, were based on estimates prepared by Ryder Scott.

Annually, from 1998 until 2000, Ryder Scott continued to provide reserve reports to Seven Seas in which Ryder Scott estimated the proved reserves for the Guaduas Field. The proved reserves estimates ranged from 34.88 million barrels of oil in 1999 to 47.99 million barrels in 2000. In each of these years, Seven Seas also filed a "Form 10-K" with the SEC based on information incorporated from Ryder Scott's reserve reports, including the proved reserve estimates stated in each report. The discounted net value of the oil reserves stated in the 10-K forms ranged from $115.9 million to $311.4 million.

Beginning in 1999 and continuing through 2000, Appellants purchased unsecured interests in the notes (hereinafter, "the Unsecured Bonds") issued by Seven Seas. Before making these purchases, appellants reviewed Seven Seas's 10-K forms and prospectuses, which contained the proved-reserve estimates calculated by Ryder Scott.

4

In April 2001, Seven Seas filed a form 10-K for the year end of 2000. Seven Seas stated that Ryder Scott had estimated the proved reserves for the Guaduas Field to be 47.9 million barrels of oil with a discounted net present value of over $394 million.

Also in early 2001, Seven Seas was in dire financial condition and in need of funds to continue operating. The terms of the Unsecured Bonds permitted Seven Seas to obtain senior secured indebtedness no greater than 30 percent of the value of its discounted net reserves. Based on Ryder Scott's estimates, the value of Seven Seas' discounted net receivables from its proved oil reserves was $394.1 million.

Based on the reserve estimates, Seven Seas issued $45 million in Secured Notes. Chesapeake Energy, an independent oil and gas producer, purchased $22.5 million of the Secured Notes in July 2001.

In April 2002, Seven Seas filed another 10-K report. The report indicated that Ryder Scott had estimated the proved reserves for the Guaduas Field to be 47.6 million barrels of oil, having a discounted net value of $272.3 million. Based on those estimates, Seven Seas held reserves greater than its debt, including the $45 million owed on the Secured Notes.

From January to April 2002, Appellants purchased additional Unsecured Bonds. Then, on August 24, 2002, Seven Seas announced its results from Ryder

Scott's mid-year review. Based on a new reserve report provided by Ryder Scott, Seven Seas's net proved reserves for the Guaduas Field were revised downward from 47.6 million barrels of oil to 16.3 million barrels. The discounted net value of Seven Seas's proved reserves dropped from $273.3 million on December 31, 2001 to $136 million on June 30, 2002. Seven Seas could no longer pay the interest that it owed on the Unsecured Bonds. Ultimately, Seven Seas sold the Guaduas Field for $20 million. Because Seven Seas was no longer able to meet its financial obligations, a group of unsecured creditors, including Appellants, filed an involuntary petition for relief against Seven Seas under Chapter 7 of the United States Bankruptcy Code.

Appellants filed the instant suit in state court against Ryder Scott and Chesapeake Energy. Appellants asserted common-law claims for negligent misrepresentation and fraud against only Ryder Scott. Against Ryder Scott and Chesapeake Energy, Appellants asserted claims for violating section 33F(2) of the Texas Securities Act, the "aider and abettor" liability provision. It also pursued claims for conspiracy to defraud and for aiding and abetting fraud.

Underlying all of Appellants' claims is its assertion that Ryder Scott overestimated the volume of the proven oil reserves in the Guaduas Field from 1997 until mid-2002. Appellants allege that the overvaluation resulted from Ryder Scott's failure to apply generally accepted engineering practices and to follow SEC

6

guidelines, including those found in Regulation S-X, as required, in formulating the reserve estimates for the Guaduas Field. Appellants asserted that, despite its representations in its reserve reports, Ryder Scott knew, or based on its expertise, should have known, that it had not followed SEC regulations in estimating the petroleum reserves. Appellants also claim that Ryder Scott's representations in its reserve reports that it followed the published findings of Dr. Roberto Aguilera, a world-renowned oil and gas expert, regarding the recovery factor for the Guaduas Field, were false.

Appellants claim that Ryder Scott knew that Seven Seas would incorporate and rely on the reserve estimates in its SEC filings, specifically its 10-K forms and prospectuses. Appellants also allege that, based on common business practices, Ryder Scott knew or should have known that investors would examine and rely on the proved reserve estimates contained in the 10-K forms and prospectuses in deciding whether to invest.

Appellants contend that they did rely on Ryder Scott's reserve estimates incorporated into Seven Seas's 10-K forms and prospectuses. Based on these filings, Appellants allege that they decided to invest in the Unsecured Bonds and to later refrain from selling the investments. They allege that Ryder Scott's overestimation of the oil reserves has resulted in their loss of "almost all their

investment." In their fourth amended petition, Appellants alleged that they purchased Unsecured Bonds with a total worth of $23,637,000.

Appellants also allege that Chesapeake Energy knew that Ryder Scott had overestimated the proved oil reserves. As a basis for this knowledge, Appellants point to Chesapeake Energy's own due diligence in reviewing the reserve estimate data. They also point out that one of Chesapeake Energy's officers had previously been a Seven Seas's corporate officer. Appellants contend that, despite its knowledge that Ryder Scott had inflated the reserve estimate, Chesapeake Energy nonetheless purchased the Secured Notes because the purchase "had little-to-no downside." Appellants point out that Chesapeake Energy's "interests were secured by all of Seven Seas's assets (including the proved reserves)." They assert that Chesapeake Energy's interests "had priority over any claim that could be asserted by the [unsecured] investors," such as Appellants. Appellants contend that Chesapeake Energy aided Seven Seas in perpetuating the misrepresentations regarding the reserve estimates by loaning Seven Seas money to continue its operations.

Ultimately, Appellants' claims against Ryder Scott and Chesapeake Energy were dismissed by dispositive motions.[3] The trial court granted Ryder Scott's and

---

[3]     Motions for summary judgment other than those discussed *infra* were also filed in the trial court. We limit our discussion to those motions germane to the disposition of this appeal.

Chesapeake Energy's "traditional" Rule 166a(c) motions for partial summary judgment regarding Appellants' claims for violations of the Texas Securities Act and for conspiracy to defraud. The trial court did not specify the grounds on which it granted these motions. In conjunction with granting the motions, the trial court sustained a number of the defendants' evidentiary objections regarding certain documents offered by Appellants in support of their summary judgment responses. Significant among these, the trial court sustained Ryder Scott's objection to a copy of Regulation S-X appended to the affidavit of Appellants' engineering expert.

Pursuant to Rule of Civil Procedure 166a(i), the trial court also granted Ryder Scott's no- evidence motion for partial summary judgment with respect to Appellants' negligent misrepresentation and fraud claims. In its order, the trial court stated that Appellants had failed to offer evidence supporting the damages element of these claims. Specifically, the trial court determined that Appellants had not adduced sufficient evidence to show the value of the securities received by them, a necessary showing with respect to the damages element for these causes of action. The trial court further stated that Appellants had not offered sufficient evidence because they had not offered expert testimony to establish the value of the securities received.

Lastly, the trial court granted Ryder Scott's and Chesapeake Energy's special exceptions to Appellants' cause of action for aiding and abetting fraud.

Based on this ruling, the trial court later struck the cause of action from Appellants' petition.

Taken together, the orders on the dispositive motions constituted a final, appealable judgment against Appellants in favor of Ryder Scott and Chesapeake Energy. This appeal followed.

Appellants identify seven issues on appeal. Appellants contend as follows: (1) the trial court erred in granting traditional summary judgment with respect to their Texas Securities Act and conspiracy to defraud claims; (2) the trial court abused its discretion in sustaining Ryder Scott's evidentiary objection to the copy of Regulation S-X offered in support of Appellants' summary judgment response; (3) the trial court erred in granting Ryder Scott's no-evidence motion for summary judgment on the ground that Appellants offered no evidence of damages; and (4) the trial court erred when it granted the defendants' special exceptions and struck its aiding and abetting fraud cause of action.

**Fraud and Negligent Misrepresentation**

In their fifth issue, Appellants contend that the trial court erred when it granted Ryder Scott's no-evidence motion for summary judgment regarding their common law fraud and negligent misrepresentation claims.

## A.    Standard of Review: No-Evidence Motion for Summary Judgment

We review summary judgments de novo.  *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).  After an adequate time for discovery, the party without the burden of proof may move for a no-evidence summary judgment on the basis that there is no evidence to support an essential element of the non-moving party's claim.  TEX. R. CIV. P. 166a(i); *see Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).  Summary judgment must be granted unless the non-movant produces competent summary judgment evidence raising a genuine issue of material fact on the challenged elements.  TEX. R. CIV. P. 166a(i); *Hamilton*, 249 S.W.3d at 426.  A non-moving party is "not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements."  TEX. R. CIV. P. 166a (Notes & Comments 1997).

A no-evidence summary judgment motion is essentially a motion for a pretrial directed verdict.  *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex. 2006).  Accordingly, we apply the same legal-sufficiency standard of review that we apply when reviewing a directed verdict.  *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005).  Applying that standard, a no-evidence point will be sustained when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no

more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *see City of Keller*, 168 S.W.3d at 810. Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact, and the legal effect is that there is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller*, 168 S.W.3d at 822). In so doing, we view the summary judgment evidence in the light most favorable to the party against whom summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See Mack Trucks*, 206 S.W.3d at 582; *City of Keller*, 168 S.W.3d at 822.

## B. Analysis: No Evidence of Value Received

In its no-evidence motion for partial summary judgment, Ryder Scott asserted, inter alia, that Appellants could produce no evidence with respect to the damages element of their fraud and negligent misrepresentation claims. Specifically, Ryder Scott asserted, with respect to Appellants' fraud claim, that "there is no evidence to support Plaintiffs' claim for direct damages under either

12

the benefit-of-the-bargain or out-of-pocket measure because there is no evidence of the 'value received' by Plaintiffs." Ryder Scott further asserted, "With respect to the damages element, Plaintiffs seek to recover only out-of-pocket damages for negligent misrepresentation. There is no evidence to support Plaintiffs' claim for damages under the out-of-pocket measure, because there is no evidence of the 'value received' by Plaintiffs."

The trial court granted Ryder Scott's motion, explaining the basis for its ruling as follows:

> [T]he Court finds that it is required to grant that portion of Ryder Scott's Motion directed at Plaintiffs' direct damages for both their fraud and negligent misrepresentation claims. . . .
>
> The Court is persuaded that Plaintiffs, in response to Ryder Scott's No-Evidence Motion, was required to adduce summary judgment evidence sufficient to demonstrate the existence of a genuine issue of material fact on its out-of-pocket and benefit-of-the-bargain damages on its fraud claim, and on its out-of-pocket damages for its negligent misrepresentation claim . . . . To demonstrate that a genuine issue of material fact existed, the Plaintiffs were required to show the value received (the fair market value) of the bonds at the time they were purchased. The purpose of this requirement is that to measure Plaintiffs' losses, they need to be able to prove the difference between the value they paid for the bonds, and the value they received (out-of-pocket losses) at the time of the purchase. Likewise, they have to be able to prove the difference between the value received and the value as represented (benefit-of-the-bargain) damages. Establishing the fair market value of the bonds at purchase requires expert testimony.
>
> Plaintiffs do not have a damages expert designated, and thus cannot adduce expert testimony on this issue. . . . Moreover, Plaintiffs have not even attached any evidence, expert or otherwise, as to the fair

13

market value of the bonds at the time of their purchase to their response. . . .

Appellants do not dispute that the two measures of direct damages for fraud are the out-of-pocket measure and the benefit-of-the-bargain measure. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998). The out-of-pocket measure is the difference between the value paid and the value received, and the benefit-of-the-bargain measure is the difference between the value as represented and the value received. *Id.* Appellants also do not dispute that the proper measure of direct damages for negligent misrepresentation is an out-of-pocket measure; that is, "the difference between the value of what [a plaintiff] has received in the transaction and its purchase price or other value given for it." *See Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991); *see also Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 302 (Tex. App.—Dallas 2009, no pet.).

Instead, Appellants dispute the correctness of the trial court's conclusion that they did not adduce evidence of "value received." Appellants point to the affidavit of Kurt Plumer, the portfolio manager for a number of Appellants, and to the affidavit of Kenneth Funsten, the portfolio manager for other Appellants. Appellants offered these affidavits in response to Ryder Scott's motion. Appellants rely on the following affidavit testimony of Plumer:

14

The value received by the Highland-Related Purchasing Funds from their investments in the Seven Seas Subordinated Notes is equal to the amount of interest that each Highland-Related Purchasing Fund received on their Seven Seas Subordinated Notes. The interest received by each specific Highland-Related Purchasing Fund was as follows: 1) for ML CBO IV—$188,020.83; 2) for Pamco Cayman—$142,013.89, and 3) for Pam Capital—$240,648.27. Following the writedown in mid-2002 and Seven Seas' failure to make its interest payment under the indenture for the Senior Subordinated Notes in November 2002, the value of Seven Seas Senior Subordinated Notes was severely diminished because Seven Seas' secured debt exceeded the price at which Seven Seas' assets in Colombia, which were Seven Seas' only potential income-producing assets, were sold. The Noteholders received approximately 1.9 cents on the dollar through bankruptcy court proceedings.

Appellants also cite the following testimony from Funsten's affidavit:

The value received by the FamCo-Related Plaintiff Funds from their investments in the Seven Seas Subordinated Notes consists principally of the amount of interest that each FamCo-Related Plaintiff Fund received on their Seven Seas Subordinated Notes. The interest received by each specific FamCo-Related Plaintiff Fund was as follows: 1) for FamCo VIP—$3,107,396.00, and 2) for FamCo Offshore—$630,920.85. Following the writedown in mid-2002 and Seven Seas' failure to make its interest payment under the indenture for the Senior Subordinated Notes in November 2002, there was minimal value remaining in Seven Seas Senior Subordinated Notes because Seven Seas' secured debt exceeded the price at which Seven Seas assets in Colombia, which were Seven Seas' only potential income-producing assets, were sold. On April 30, 2003, FamCo VIP and FamCo Offshore distributed the Seven Seas Senior Subordinated Notes to their beneficial owners on a pro rata basis based upon their ownership in the respective funds. At that time, the value of the Seven Seas Senior Subordinated Notes was determined to be .005 (i.e., $5.00 per $1,000.00 of face value). Accordingly, FamCo VIP assigned the Seven Seas Senior Subordinated Notes a value of $48,250.00 upon disposition. FamCo Offshore assigned the Seven

Seas Senior Subordinated Notes a value of $9,250.00 upon disposition.

In addition to citing the interest paid by Seven Seas as "value received," Appellants point to the following testimony of each affiant: "When Ryder Scott wrote down Seven Seas' proved reserves in mid-2002, the asset protection provided by the proved reserves was lost, and [the plaintiffs'] investment in the Seven Seas Notes were rendered essentially worthless." Appellants assert that, because the Unsecured Notes were later determined to be "essentially worthless,"—when the more accurate estimation of the proven reserves was revealed in mid-2002—it follows that the Unsecured Notes would have been valued at zero had that same information been known at the time of Appellants' investments.

To survive Ryder Scott's no-evidence motion for summary judgment, Appellants needed to show "value received" by adducing evidence raising an issue of material fact regarding *the fair market value* of the Unsecured Bonds *at the time* Appellants purchased them.[4] *See Arthur Andersen & Co. v. Perry Equip. Corp*., 945 S.W.2d 812, 817 (Tex. 1997) (holding that the out-of-pocket measure and the

---

[4]    In their principal brief, Appellants contend as follows:

In its No-Evidence Motion for Summary Judgment, Ryder Scott's argument regarding damages consists of two statements that "there is no evidence of the 'value received' by Plaintiffs." It was not until Ryder Scott submitted its No-Evidence Reply that Ryder Scott

16

benefit-of-the-bargain measure are determined at the time of sale); *Sobel v. Jenkins*, 477 S.W.2d 863, 868 (Tex. 1972) (indicating that value received is determined by evidence of fair market value); *see also Woodyard v. Hunt*, 695 S.W.2d 730, 733 (Tex. App.—Houston [1st Dist.] 1985, no writ). Appellants' summary judgment evidence is insufficient to raise a genuine issue of material fact.

Appellants do not explain how the affiants' testimony regarding the interest that was paid on the bonds after their purchase is probative of the fair market value of the bonds at the time of their purchase. The connection is not obvious. No reasonable inference can be drawn regarding the fair market value of the

---

specified that what it meant by 'value received' was 'value received' *at the time of Appellants' purchase* of the bonds. (Emphasis in original.)

Under Rule 166a(i), a no-evidence summary judgment motion must state the specific elements as to which there is no evidence; that is, it must not be general or conclusory. *See* TEX. R. CIV. P. 166a(i); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207 (Tex. 2002). The purpose of the specificity requirement is to provide the non-movant with fair notice of the matters on which it must produce some evidence. *Doherty v. Old Place, Inc.*, 316 S.W.3d 840, 843 (Tex. App.—Houston [14th Dist.] 2010, no pet.). As mentioned, in its no-evidence motion, Ryder Scott asserted with respect to Appellants' fraud claim that "there is no evidence to support Plaintiffs' claim for direct damages under either the benefit-of-the-bargain or out-of-pocket measure because there is no evidence of the 'value received' by Plaintiffs." Ryder Scott also asserted, "With respect to the damages element, Plaintiffs seek to recover only out-of-pocket damages for negligent misrepresentation. There is no evidence to support Plaintiffs' claim for damages under the out-of-pocket measure, because there is no evidence of the 'value received' by Plaintiffs." We conclude that Ryder Scott's no-evidence motion was sufficiently specific because it identified the specific element and gave Appellants fair notice of that on which it had to produce evidence. *See id.*

Unsecured Bonds at the time of purchase from the testimony regarding the interest payments received by Appellants.

We also disagree with Appellants that Plumer's and Funsten's testimony indicating that the Unsecured Bonds were later considered "essentially worthless" is, without more, competent evidence sufficient to raise a genuine issue of material fact regarding the fair market value of the securities at the varying times Appellants purchased the bonds. *See Woodyard*, 695 S.W.2d at 733 (explaining in fraud case "damages are measured by comparing values represented and received at the time of sale, not at some future time"). Affiants' imprecise testimony stating that the securities were later considered "essentially worthless" does not permit an inference that the securities had no greater value at the time of Appellants' purchases.

Appellants' petition states that the Unsecured Bonds were purchased over a three-year period, some more than three years before the adjusted valuation of the oil reserves in mid-2002. The affiants' testimony and undisputed portions of the record indicate that events affecting Seven Seas' assets transpired during that time frame. For example, as discussed by the affiants, Seven Seas incurred secured debt during that period. Seven Seas also conducted exploration activities in the Guaduas Field during that time leading to more information about the field's oil reserves. The potential effect of these and other events on the value of the

18

securities issued by Seven Seas highlights that the affiants' statements regarding the subsequent worthlessness of the securities is not evidence from which a fact finder could calculate the fair market value of the securities at the various times of Appellants' purchases.

We conclude that Appellants did not meet their summary judgment burden to produce competent evidence to raise a genuine issue of material fact regarding the value they received when they purchased the Unsecured Bonds.[5] *See* TEX. R. CIV. P. 166a(i). We hold that the trial court did not err in granting Ryder Scott's no-evidence motion for summary judgment regarding Appellants' fraud and negligent misrepresentation claims.[6] *See id*.

We overrule Appellants' fifth issue.

## Conspiracy and Aiding and Abetting Fraud Claims

In their fourth issue, Appellants challenge the trial court's order granting Chesapeake Energy's traditional motion for summary judgment on Appellants' conspiracy claim. Appellants contend in their sixth issue that the trial court erred

---

[5]  Appellants also challenge the trial court's conclusion that expert testimony is required to determine the value of the securities at the time of their purchase. Because of our disposition of Appellants' fifth issue, we need not determine whether expert testimony is required.

[6]  Ryder Scott also filed a traditional motion for partial summary judgment regarding Appellants' fraud and negligent misrepresentation claims. The trial court denied the motion for summary judgment. Ryder Scott challenges the trial court's ruling on appeal. Because of our disposition of Appellants' sixth issue, we need not reach Ryder Scott's challenge.

19

by sustaining Ryder Scott's and Chesapeake Energy's special exceptions and dismissing their aiding and abetting fraud claims.[7]

Appellants did not allege that Chesapeake Energy committed fraud; rather, they asserted in their fourth amended petition that Chesapeake Energy and Seven Seas entered into a scheme to defraud Appellants "by [Seven Seas] issuing and [Chesapeake Energy] purchasing the Secured Notes . . . in order to decrease the assets available to investors in [the Unsecured Bonds]." Appellants continued, "Chesapeake Energy and Seven Seas accomplished this fraud by employing the material misrepresentations and/or omissions contained in Ryder Scott's reserve reports in order to induce potential investors and existing investors in Seven Seas Notes, including Plaintiffs, to either acquire interests in such Notes or to refrain from selling interest in such Notes." Appellants also alleged, "Chesapeake Energy knew that the representations and/or omissions contained in Ryder Scott's reserve estimates were false or had been made with reckless disregard as to their truth."

Appellants alleged that Ryder Scott and Chesapeake Energy aided and abetted Seven Seas's fraud by providing it with "substantial assistance and

---

[7] The trial also dismissed Appellants' "holder" claims. Appellants do not present an issue with regard to the dismissal of their holder claim. We note that the Supreme Court of Texas in *Grant Thornton LLP v. Prospect High Income Fund* determined that "holder claims, to the extent they are viable, must involve a direct communication between the plaintiff and the defendant." 314 S.W.3d 913, 930 (Tex. 2010). Here, Appellants do not allege that there was any direct communication between them and Ryder Scott or Chesapeake Energy.

encouragement." All of the allegations of fraud against Seven Seas are premised on Ryder Scott's alleged misrepresentations in the reserve reports. Because the fraud claim against Ryder Scott based on those misrepresentations fails, as discussed *supra*, the conspiracy claim dependent on that fraud also fails. *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 930–31 (Tex. 2010). Therefore, summary judgment on Appellants' conspiracy to defraud can be upheld for this reason. *See id.*

Similar reasoning applies to the aiding and abetting fraud claims. Even if we assume that it was improper for the trial court to dismiss Appellants' claims following its grant of the special exceptions, such error would be harmless. The harmless error rule states that before reversing a judgment because of an error of law, the reviewing court must find that the error amounted to such a denial of the appellant's rights as was reasonably calculated to cause and probably did cause "the rendition of an improper judgment," or that the error "probably prevented the appellant from properly presenting the case [on appeal]." *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) (citing Tex. R. App. P. 44.1(a)). The rule applies to all errors. *Id.*

Here, Ryder Scott and Chesapeake Energy can never be held liable for common law aiding and abetting fraud because the claim is dependent on Appellants' fraud claim. *See Grant Thornton*, 314 S.W.3d at 930–31. Thus, the

21

trial court's later, proper grant of summary judgment on Appellants' fraud claim rendered harmless any error by the trial court in earlier dismissing Appellants' aiding and abetting fraud claims by way of special exception. *See G & H Towing Co*, 347 S.W.3d at 297–98 (holding that error in granting summary judgment on vicarious liability claim for defendant-employer, when such relief was not requested in summary judgment motion, was harmless because summary judgment was properly granted for defendant-employee on whose tortious conduct vicarious liability was based); *Progressive Cnty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 921 (Tex. 2005) (concluding that any error committed by granting summary judgment on insurance bad-faith and extra-contractual claims was harmless because jury's finding in later proceeding negated coverage, which was prerequisite for asserting bad-faith and extra-contractual claims); *see also Brown Servs., Inc. v. Brown*, No. 01–98–00304–CV, 1999 WL 681964, at *9 (Tex. App.—Houston [1st Dist.] Sept. 2, 1999, pet denied ) (not designated for publication) (holding that "error, if any, in dismissing plaintiffs' claims of conspiracy to tortiously interfere with the employment contract, was rendered harmless by the jury's failure to find any of the defendants liable on the underlying tort of tortious interference with contract"). The trial court's dismissal of Appellants' aiding and abetting fraud claims should be affirmed. *See* TEX. R. APP. P. 44.1(a).

We overrule Appellants' fourth and sixth issues.

22

**Texas Securities Act Claims**

Appellants sued Ryder Scott and Chesapeake Energy for violating section 2 of article 33F of the Texas Securities Act, which imposes joint and several liability on aiders and abettors in fraudulent securities transactions. *See* TEX. REV. CIV. STAT. ANN. art. 581–33F(2) (Vernon 2010). In their first and second issues, Appellants challenge the trial court's order granting Ryder Scott's and Chesapeake Energy's motions for summary judgment on Appellants' security act claims. Appellants' third issue presents a challenge to the trial court's ruling sustaining a hearsay objection to a copy of Regulation S-X, offered in support of Appellants' summary judgment response.

We begin by reviewing the propriety of the trial court's decision to grant summary judgment on Appellants' claims against Ryder Scott and Chesapeake Energy for violating Section 33F(2) of the Texas Securities Act.

**A.      Standard of Review: Traditional Motion for Summary Judgment**

To prevail on a "traditional" Rule 166a(c) summary judgment motion, a movant must prove that there is no genuine issue regarding any material fact and that it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Little v. Tex. Dep't of Criminal Justice*, 148 S.W.3d 374, 381 (Tex. 2004). A defendant moving for summary judgment must either (1) disprove at least one element of the plaintiff's cause of action or (2) plead and conclusively establish each essential

23

element of an affirmative defense to rebut the plaintiff's cause. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). The movant must conclusively establish its right to judgment as a matter of law. *See MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *See City of Keller*, 168 S.W.3d at 816.

If the movant meets its burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

On appeal, we review de novo a trial court's summary judgment ruling. *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). In our review, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). When, as here, the trial court's order granting summary judgment does not specify the grounds on which it was granted, it must be affirmed if any of the

24

grounds asserted are meritorious. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

**B.      Texas Security Act Provisions**

The Texas Securities Act ("TSA") establishes both primary and secondary liability for securities violations. Primary liability arises in various circumstances. As found in Section 33A(2), primary liability attaches when a person offers or sells a security "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." TEX. REV. CIV. STAT. ANN. art. 581–33(A)(2) (Vernon 2010). Section 33C(2) also imposes primary liability on issuers of registered securities purchased on a secondary market when the issuer makes an untrue statement or omission of material fact in the prospectus under which the securities were issued. *See id.* art. 581–33(C)(2).

Secondary liability is derivative liability for another person's securities violation; it attaches to an aider, defined as one "who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security . . . under Section 33A, 33B, or 33C."[8] *See id.* art. 581–33F(2). Aiders are jointly and severally liable with the primary violator "to the same extent as if [they] were" the primary violator. *Id.*

---

[8]      TSA Section 33F(2), defining aider liability, reads as follows:

25

To prove secondary aider liability, the plaintiff must demonstrate:

(1) a primary violation of the securities laws occurred; (2) the alleged aider had "general awareness" of its role in this violation; (3) the actor rendered "substantial assistance" in this violation; and (4) that the alleged aider either (a) intended to deceive the plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator.

*Darocy v. Abildtrup*, 345 S.W.3d 129, 138–39 (Tex. App.—Dallas 2011, no pet.); *Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

## C. Summary Judgment in Favor of Chesapeake Energy

In their fourth amended petition, Appellants sought to hold Chesapeake Energy liable for claims under the TSA for aiding "the sellers" of the Unsecured Bonds in violating section 581–33(A)(2). *See* TEX. REV. CIV. STAT. ANN. art. 581–33(F)(2); *see also id.* art. 581–33(A)(2). To support this claim, Appellants alleged that "[a]s a result of Chesapeake Energy's material aid in the sale of securities through material misrepresentations and/or omissions, Plaintiffs have suffered damages . . . ."

---

A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

TEX. REV. CIV. STAT. ANN. art. 581–33(F)(2) (Vernon 2010).

Appellants also allege that Chesapeake Energy violated the TSA by aiding Seven Seas, a non-selling, registered issuer of a security, in violating article 581–33(C)(1).  In this regard, Appellants asserted,

> The prospectus required in connection with the registration of Seven Seas Notes contained, as of its effective date, an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

Among other grounds, Chesapeake Energy sought summary judgment on the basis that it did not have "general awareness" of its role in the alleged primary violations, a showing required for Section 33F(2) aider liability.  In this regard, Chesapeake Energy asserted as follows:

> The summary judgment evidence negates an essential element of Plaintiffs' aiding and abetting cause of action under article 581–22(F)(2) of the TSA because the evidence shows that Chesapeake had no knowledge or awareness that its purchase of the Secured Notes was part of an alleged overall scheme to defraud the unsecured creditors.

In support of this ground, Chesapeake Energy argued, in its motion for summary judgment, as follows:

> The summary judgment evidence establishes that Chesapeake had no knowledge whatsoever of any alleged misrepresentations, omissions, or fraud by Seven Seas.  Chesapeake purchased the Secured Notes as a good-faith investment in Seven Seas.  Furthermore, Chesapeake had no reason to know or suspect that the reserve estimates prepared by Ryder Scott and published by Seven Seas in its public filings purportedly contained any false information.  Based on the data contained in the reports, Chesapeake concluded that Ryder Scott's

27

reserve estimates appeared accurate and reasonable. Chesapeake did not perform an independent assessment of Seven Seas' proved reserves or the Ryder Scott reserve reports. In fact, Chesapeake itself relied on the Ryder Scott reserve estimates in deciding to invest in Seven Seas.

To meet its summary judgment burden, Chesapeake Energy offered the affidavit testimony of three corporate representatives, as follows:[9]

- Marcus Rowland, Chesapeake Energy's chief financial officer, testified that he was the primary representative involved in Chesapeake Energy's purchase, in July 2001 of the $22.5 million Secured Notes. He stated that the purchase was a "good faith investment in Seven Seas." Rowland averred that Chesapeake Energy "purchased the Secured Notes in order to obtain the protection that might be afforded by the fact that the notes were secured." He testified that Chesapeake Energy "had no knowledge of any alleged irregularities or mistakes in the reserve reports prepared by Ryder Scott Company [] for Seven Seas or in the information provided to the public by Seven Seas." He further stated, "In fact Chesapeake also relied on the reserve reports prepared by Ryder Scott in making its decision to purchase $22.5 million of the Seven Seas Secured Notes." Rowland averred that "[a]t no time prior to its purchase of the Secured Notes in July 2001, or thereafter, did Chesapeake know, or have reason to know or suspect, that Ryder Scott would reduce its estimate of Seven Seas' proved reserves. Rowland testified that Chesapeake Energy did not discuss with Seven Seas, before or after its July 2001 purchase of the Secured Notes, "any plan, scheme, agreement . . . to decrease or otherwise affect the assets that would be available to the unsecured creditors of Seven Seas." According to Rowland, Chesapeake Energy did not know of Appellants or their purchases of the Unsecured Bonds before its 2001 purchase of the Secured Notes; nor was it aware that Appellants intended to purchase additional unsecured notes after July 2001.

---

[9]     We note that an uncontroverted, self-serving affidavit from an interested witness may serve as the basis for granting summary judgment if the evidence is "clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *Trico Techs. Corp. v. Montiel*, 949 S.W.2d 308, 310 (Tex. 1997) (citing *Republic Nat'l Leasing Corp. v. Schindler*, 717 S.W.2d 606, 607 (Tex. 1986)); *see* TEX. R. CIV. P. 166a(c).

- Mark Lester, Chesapeake Energy's executive vice-president of exploration, testified in his affidavit that, in July 2001, Chesapeake Energy did not know, nor did it have reason to know or suspect, that Ryder Scott's reports "contained any alleged irregularities or mistakes." He stated that Chesapeake Energy "believed that the Ryder Scott reserve estimates were accurate and reasonable." Lester testified that at no time did Chesapeake Energy "know, or have reason to know or suspect, that Ryder Scott would reduce its estimate of the Seven Seas' proved reserves."

- Breen Kerr testified that he was on the board of directors for Chesapeake Energy from 1993 until 2009. He stated that he was also a member of Seven Seas' board of directors from 1997 until 2000. Breen stated that, in his role as a director of Chesapeake Energy, he was "generally aware" of the purchase of the Secured Notes by Chesapeake Energy in July 2001 but that he did not participate, advise, or counsel Chesapeake Energy or Seven Seas in the transaction directly or indirectly. He further stated that as director of Seven Seas he "was generally aware of the reports prepared by Ryder Scott [] that contained estimates of the proved oil reserves attributable to the shallow oil field (also known as the Guaduas Oil Field) operated by Seven Seas," but to his knowledge, "there were no irregularities or mistakes in the Ryder Scott reserve reports or in the reserve information provided to the public by Seven Seas." Also in his role as a director of Seven Seas, Breen was "generally aware of the drilling program that Seven Seas planned to undertake for . . . the Guaduas Field." However, Breen testified that he did not know, and had no reason to know or suspect, "that Seven Seas' drilling program would be unsuccessful or that Ryder Scott would later reduce its estimate of Seven Seas' proved reserves." Lastly, Breen stated that, during the time that he was director of each company, he never had discussions regarding a scheme or plan "to decrease or otherwise affect the assets that would be available to the unsecured creditors of Seven Seas."

In *Sterling Trust Co. v. Adderley*, the Supreme Court of Texas clarified that TSA section 33F contains a "general awareness" requirement. *See* 168 S.W.3d 835, 842 (Tex. 2005). It concluded that a plaintiff must prove that an aider was aware of the primary violator's improper activities before the alleged aider may be held liable for assisting in the securities violation, even when the aider is alleged to

29

have acted with only "reckless disregard for the truth or the law." *Id.* In reaching this conclusion, the court recognized, "When the Texas Legislature adopted the aider provision of the TSA, it explicitly stated that aider liability should be imposed 'only if the aider has the requisite scienter.'" *Id.* at 842 (citing TEX. REV. CIV. STAT. ANN. art. 581–33, Comment—1977 Amendment). The court explained that "[f]ederal courts have typically used the term 'general awareness' as a shorthand to describe actual awareness of general wrongdoing." *See id* at 841 n.3.

The *Sterling Trust* court cited *Gould v. American–Hawaiian S.S. Co.*, 535 F.2d 761, 779–80 (3d Cir. 1976), in which the Third Circuit explained that "[t]he required knowledge of the act has been defined as a 'general awareness (on the part of the aider and abettor) that his role was part of an overall activity that is improper'" and that "the proof offered must establish conscious involvement in impropriety or constructive notice of intended impropriety." *Id.* at 840. The court also cited *Woodward v. Metro Bank of Dall.*, 522 F.2d 84, 96 (5th Cir. 1975) in which the Fifth Circuit stated that "[t]he postman who mails a fraudulent letter is not covered by the Act, nor is the company that manufactured the paper on which the violating documents are printed," rather "the proof must demonstrate actual awareness of the party's role in the fraudulent scheme." *Id.* at 840–41.

The *Sterling Trust* court disagreed with the court in *Goldstein v. Mortenson*, 113 S.W.3d 769, 777 (Tex. App.—Austin 2003, no pet.), which stated that a

30

"failure to conduct minimal investigation and inquiry" before rendering assistance with a securities transaction can suffice to create liability under the "reckless disregard." *Id.* at 841. Relying on United States Supreme Court case law, the Texas supreme court further concluded that, "the TSA's scienter requirement of 'reckless disregard for the truth or the law' is similarly intended to impose a requirement of 'recklessness in its subjective form,' and this recklessness must be directly related to the primary violator's securities violation." *Id.* at 842 (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536, 119 S. Ct. 2118, 2125 (1999)). The court ultimately held that "an alleged aider can only be held liable if it rendered assistance 'in the face of a perceived risk' that its assistance would facilitate untruthful or illegal activity by the primary violator." *Id.* at 842 (citing TEX. REV. CIV. STAT. ANN. art. 581–33(F)(2); *Kolstad*, 527 U.S. at 536, 119 S. Ct. at 2125). "In order to perceive such a risk, the alleged aider must possess a 'general awareness that his role was part of an overall activity that is improper.'" *Id.* (quoting *Gould*, 535 F.2d at 779–80).

Here, the question becomes whether Chesapeake Energy conclusively showed, as a matter of law, that it was not aware of its role in the alleged primary violations because it was not aware that the proved oil reserve estimates were inflated, an allegation central to Appellants' TSA claims.

31

The affidavits offered by Chesapeake Energy, set out above, are clear, positive, and direct; they appear otherwise credible and are free from contradictions and inconsistencies, and could have been readily controverted. *See Trico Techs. Corp. v. Montiel*, 949 S.W.2d 308, 310 (Tex. 1997) (discussing requirements for testimony from interested witness offered in support of summary judgment motion). The affidavits explicitly state that Chesapeake Energy was not aware that the proved reserve estimates supplied by Ryder Scott were inaccurate or contained "irregularities." The evidence showed Chesapeake Energy was unaware that the proved reserve estimates would later be reduced by Ryder Scott. The evidence also showed that Chesapeake Energy relied on Ryder Scott's reserve estimates in deciding to loan Seven Seas $22.5 million.

Even viewing the summary judgment evidence in the light most favorable to Appellants, Chesapeake Energy met its initial summary judgment burden to negate the general awareness element of Appellants' Section 33F aider liability cause of action. Chesapeake Energy conclusively showed, as a matter of law, that it was entitled to summary judgment on Appellants' TSA claim. As a result, the burden shifted to Appellants to adduce summary judgment evidence raising a genuine issue of material fact regarding the general awareness requirement. *See Centeq Realty*, 899 S.W.2d at 197.

32

Appellants assert that a genuine issue of material fact exists regarding the general awareness element because Chesapeake Energy learned that the proved reserve estimates were inflated when it reviewed the reserve reports as part of its due diligence. In support of this assertion, Appellants offered the deposition testimony of Marcus Rowland, Chesapeake Energy's chief financial officer and executive vice-president of finance. The deposition excerpt offered by Appellants contains the following testimony by Rowland:

> Q.    [D]o you know who it was at Chesapeake Energy that made the determination that the shallows [the Guaduas Field] were worth at least $45 million?
>
> A.    I don't think it was any one specific person. It would have been a collective effort.
>
> Q.    Who would have been involved in that collective effort?
>
> A.    Aubrey McClendon, Tom Ward, and myself, along with Mark Lester and the reservoir engineering staff that would have been reviewing these reports.
>
> . . . .
>
> Q.    . . . I have not been able to identify any documents that appear to be these calculations of how the shallows were determined to be worth at least $45 million. Do you know whether any such documents were ever created, sir?
>
> A.    I don't recall that we would have created any documents different than the reserve reports that you've shown here. I don't recall that we went back and redid the reserves and created our own document at all.

Q.     So it's your testimony that you believe that . . . the determination would have consisted of the professional geologists and the petroleum engineers simply looking at the Ryder Scott reports and making a determination from those reports.

A.     To the best of my recollection, that's what they would have done.

Q.     Did you take into account that there was a possibility that the shallows might not be worth 45 million?

A.     We did not believe there was a possibility that they could be worth less than $45 million or we wouldn't have made the investment.

Appellants also offered the expert affidavit of Enrique Gonzalez-Gerth, a registered professional petroleum engineer. On appeal, Appellants cite Gonzalez-Gerth's affidavit as evidence that Chesapeake Energy's due diligence review of Ryder Scott's reserve reports would have made it aware of the over-estimation of the proved oil reserves. Gonzalez-Gerth opined that Chesapeake Energy's geologists and engineers should have known, from their review of the reserve reports, that Ryder Scott's proved reserve estimates were overstated.

Appellants cite the following affidavit testimony of Gonzalez-Gerth:

If an engineer were to perform a rudimentary review of the Ryder Scott Report for year-end 2000, which would have been the most recent Ryder Scott Report at the time of the July 2001 secured financing led by Chesapeake, that engineer would immediately note that a material portion of the proved acreage should not have been classified as proved because the acreage lies more than one offset unit from any continuously producing wells in violation of Regulation § 210.4-10 (a)(4). Regulation § 210.4-10 is entitled the "Financial Accounting and Reporting for Oil and Gas Producing Activities Pursuant to the Federal Securities Laws and the Energy Policy and Conservation Act of 1975." These are the federal regulations that

petroleum engineers are required to apply when classifying oil reserves as proved for documents that are to be filed with the SEC. Thus, with even a rudimentary examination of Ryder Scott's Reserve Report for year-end 2000, an engineer would have known that Seven Seas' proved reserves were materially overstated.

Gonzalez-Gerth also testified as follows:

[T]here is another significant problem in Ryder Scott's Reserve Report that is obvious from simple review. In its 2000 Reserve Report, Ryder Scott describes the recovery mechanism for the Guaduas Field as gravity segregation with a secondary gas cap being formed during production. This drive mechanism is commonly referred to as "gravity segregation with counterflow." Any competent engineer would immediately know that gravity segregation with counterflow could not be the proper recovery mechanism for the Guaduas Field in 2000 because it takes many years of demonstrated continuous production before gravity segregation can be established as a recovery mechanism for an oil field. According to Ryder Scott's own report, none of the wells in the Guaduas Field were even going to begin production until July 2001 or later.

[I]f an engineer had received access to any of the reports generated by Dr. Roberto Aguilera, a world renowned expert on fractured reservoirs such as the one involved in this case, regarding the Guaduas Field, that engineer would immediately see that the recovery factor for the Guaduas Field should have been around 7%, and certainly never above 10%. Since Ryder Scott had been using a recovery factor of 30% in its reserve reports from 1997 until mid-2002, this engineer would have immediately known that Seven Seas' proved reserves were materially overstated.

Even when viewed in the light most favorable to Appellants, and indulging all reasonable inferences in their favor, Gonzalez-Gerth's affidavit testimony serves only to show what a competent professional engineer *should have known*

35

from reviewing the reserve reports. The testimony is not evidence of what Chesapeake Energy's engineering staff in fact actually knew.

No evidence was presented showing that Chesapeake Energy recalculated or fully audited the reserve estimates made by Ryder Scott. Nor was evidence presented that its review was intended to satisfy the requirements Regulation S-X. To the contrary, Rowland's testimony indicates that Chesapeake Energy's staff did not redo the underlying calculations. Moreover, no evidence was offered to show the manner or the extent of Chesapeake Energy's review, which was for its own internal use. At best, Gonzalez-Gerth's affidavit raises a fact question whether Chesapeake Energy's engineers were negligent in their due diligence review of the reserve reports prepared by Ryder Scott.[10]

The supreme court in *Sterling Trust* made it clear: showing that a defendant acted negligently in failing to discover the improper activity creating primary liability or showing that it "should have known" does not satisfy the scienter requirement for aider liability under Section 33F of the TSA. *See Sterling Trust*, 168 S.W.3d at 842, 844–45. Thus, we conclude that Rowland's and Gonzalez-Gerth's testimony does not raise a genuine issue of material fact on the element of general awareness.

---

[10] In contrast, Ryder Scott actively calculated the reserve estimates and affirmatively represented in its published report prepared for Seven Seas's that the calculations had been made according to SEC guidelines.

Appellants further argue that a genuine issue of material fact exists regarding the general awareness element because Chesapeake Energy gained knowledge that the reserve estimates were inflated by sharing a director, Breen Kerr, with Seven Seas. In its brief, Appellants summarize its evidence as follows:

> Appellants . . . submitted summary judgment evidence that Breen Kerr was a registered geologist who sat on Seven Seas' board of directors in 1997 when Seven Seas drilled a well that indicated the existence of a massive gas cap that would have eliminated one-half to two-thirds of Seven Seas proved reserves, and . . . Breen Kerr continued to sit on Seven Seas' board of directors when Seven Seas drilled a second well in 1999 that further confirmed the existence of this gas cap. Appellants submitted further summary judgment evidence that this same Breen Kerr was also sitting on Chesapeake's board of directors at the time of the secured financing transaction in 2001.

Appellants' evidence does not show how Kerr, in his role as a director of Seven Seas, gained personal knowledge that the wells drilled in 1997 and in 1999 indicated a gas cap, which in turn, indicated that the proved reserve estimates were inflated. Chesapeake Energy has offered no evidence showing that the information was transmitted to Kerr. In their brief, Appellants assert that "[t]he lack of producible reserves from the Guaduas Field was an issue that was discussed by the Seven Seas' board of directors." Appellants offer no evidence to show that such discussions occurred during the time Kerr was a director or that he was privy to such discussions. We conclude that Appellants' evidence relating to Kerr's status as a dual director of Seven Seas and Chesapeake Energy did not raise a genuine

37

issue of material fact regarding whether Chesapeake Energy was aware that the reserve estimates were inflated.

Chesapeake Energy met its summary judgment burden by negating the element of general awareness as a matter of law. Appellants did not meet their summary judgment burden as non-movant by raising a genuine issue of material fact on that element. We hold that the trial court did not err in granting summary judgment on Appellants' claim that Chesapeake Energy violated Section 33F(2) of the Texas Securities Act by aiding violations of TSA Sections 33A(2) and 33C.

We overrule Appellants' second issue.

## D. Summary Judgment in Favor of Ryder Scott

### 1. Claim for Aiding Primary Violation Committed by Seller

Appellants sued Ryder Scott under the TSA for aiding "the sellers" of the Unsecured Bonds in their primary violation of Section 33(A)(2). *See* TEX. REV. CIV. STAT. ANN. art. 581–33(F)(2); *see also id*. art. 581–33(A)(2). A primary violation occurs under Section 33A(2) when a person offers or sells a security "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." *Id.* art. 581–33(A)(2). The seller is liable to the person buying the security from him. *Id.* A party is secondarily liable under Section 33F if it "directly or indirectly with the intent to

38

deceive or defraud or with reckless disregard for the truth or the law materially aids *a seller* . . . under section 33A . . . ." *See id.* art. 33(F)(2) (emphasis added).

Ryder Scott sought summary judgment on the basis that the identities of the sellers of the Unsecured Bonds were unknown. It asserted that a primary violation of Section 33A(2) can only be committed by a person who "offers or sells" a security to the claimant. Ryder Scott argued that it could be held secondarily liable under Section 33F(2) for aiding a violation of Section 33A(2) only if the identity of the seller is known. Ryder Scott acknowledged that the identity of the brokers "who served as intermediaries between Plaintiffs and the seller for each purchase" were known. Nonetheless, Ryder Scott asserted that because the brokers did not hold or pass title to the securities they were not "sellers" for TSA purposes. Ryder Scott argued that because the identity of the "sellers," i.e., the party passing title to Appellants, could not be ascertained, it was entitled to summary judgment as a matter of law.[11]

We agree with Appellants that Ryder Scott's assertion is only valid if Ryder Scott conclusively proved, as matter of law, that the brokers from whom Appellants obtained the Unsecured Bonds were not "sellers" for purposes of

---

[11]     Ryder Scott also asserts that a plaintiff seeking aider liability must also sue the primary violator. Here, Appellants did not sue the brokers. Ryder Scott has not cited any authority supporting this proposition. We do not read Section 33F(2) to impose such a requirement.

39

Section 33A.[12]  We also agree with Appellants that Ryder Scott did not meet this

burden.

Relevant to this issue, the TSA includes the following definitional provision:

The terms "sale" or "offer for sale" or "sell" shall include every disposition, or attempt to dispose of a security for value.  The term "sale" means and includes contracts and agreements whereby securities are sold, traded or exchanged for money, property or other things of value, or any transfer or agreement to transfer, in trust or otherwise.  . . .  The term "sell" means any act by which a sale is made, and the term "sale" or "offer for sale" shall include a subscription, an option for sale, a solicitation of sale, a solicitation of an offer to buy, an attempt to sell, or an offer to sell, directly or by an agent . . . .  Nothing herein shall limit or diminish the full meaning of the terms "sale," "sell" or "offer for sale" as used by or accepted in courts of law or equity.

TEX. REV. CIV. STAT. ANN. art. 581–4E (Vernon 2010).

The TSA, however, does not specifically define the term "seller."  Nor have

we found Texas case law holding who may be a "seller" for purposes of Section

---

[12]  Ryder Scott discusses additional bases for summary judgment on Appellants' claim for aiding a primary violation of Section 33A(2) in its reply to Appellants' summary judgment response.  We do not address these bases.  A summary-judgment movant is not entitled to use its reply to amend its motion for summary judgment or to raise new and independent summary-judgment grounds. *Reliance Ins. Co. v. Hibdon*, 333 S.W.3d 364, 378 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (citing *Garcia v. Garza*, 311 S.W.3d 28, 36 (Tex. App.—San Antonio 2010, pet. denied)).  "A motion [for summary judgment] must stand or fall on the grounds expressly presented in the motion."  *Id*. (quoting *McConnell v. Southside Indep. Sch. Dist*., 858 S.W.2d 337, 341 (Tex. 1993)).

33A primary liability, under the current version of Section 33.[13] We note that the court in *Frank v. Bear, Stearns & Co.* determined that, to impose seller liability under Section 33A(2), a plaintiff must be in privity with defendant; that is, the plaintiff must have bought the securities from the defendant. 11 S.W.3d at 383. However, the court did not define the nature of the privity required or otherwise define who qualifies as a seller for Section 33A purposes.

Texas courts generally cite decisions of the federal courts to interpret the TSA. *See, e.g., Sterling Trust*, 168 S.W.3d at 840. The Supreme Court of Texas has explained that the Texas Legislature intended the TSA "to be interpreted in harmony with federal securities law." *Id.* (citing TEX. REV. CIV. STAT. ANN. art. 581–10–lA (Vernon 2010)).

---

[13] Appellants rely on the definition of seller found in *Brown v. Cole*, 291 S.W.2d 704, 708 (Tex. 1956). In *Cole*, the Supreme Court of Texas defined the term "seller" broadly, making liable any person who served as a "link in the chain of the selling process." *Id.* With respect to this definition, the court in *Frank v. Bear, Stearns & Co*. explained why the application of this definition is now questionable:

> [R]eliance on *Cole* is undermined . . . by the fact that the [TSA] statute has been significantly amended twice since that case was decided. Under the 1977 amendments the liability for 'control persons and aiders' was incorporated into a new section of the statute; the comment pertinent to that section notes that '*Brown v. Cole*' should have no application to the new law, since § 33F provides quite specifically who, besides a person who buys or sells, is liable, and the criteria for such liability.'"

11 S.W.3d 380, 383 (Tex. App.—Houston [14th Dist.] pet. denied).

Section 12 of the Federal Securities Act states that "[a]ny person who . . . sells . . . shall be liable . . . to the person purchasing such security from him. . . ." 15 U.S.C. § 77 l (a).  The United States Supreme Court interpreted this language in *Pinter v. Dahl* to mean that a section 12(a)(1) "seller" includes either the person who actually passes title to the buyer, or "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner," for example, a broker. [14]  486 U.S. 622, 646–47, 108 S. Ct. 2063, 2078 (1988).  The Court offered the following reasoning in support of its holding:

> An interpretation of statutory seller that includes brokers and others who solicit offers to purchase securities furthers the purposes of the Securities Act—to promote full and fair disclosure of information to the public in the sales of securities. . . .  The solicitation of a buyer is perhaps the most critical stage of the selling transaction.  It is the first stage of a traditional securities sale to involve the buyer, and it is directed at producing the sale.  In addition, brokers and other solicitors are well positioned to control the flow of information to a potential purchaser, and, in fact, such persons are the participants in the selling transaction who most often disseminate material information to investors.  Thus, solicitation is the stage at which an investor is most likely to be injured, that is, by being persuaded to purchase securities without full and fair information. [15]

---

[14]     *Pinter* involved a claim under § 12(1) (now § 12(a)(1)), but that analysis applies identically to § 12(a)(2).  *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 n.10 (5th Cir. 2003).  Section 12(a)(2) is the federal counterpart to TSA Section 33A(2).

[15]     The Court explained that seller liability does not extend to the gratuitous solicitor, *id*. at 647, 108 S. Ct. at 2078, or to "collateral participants."  *Id*. at 650, 108 S. Ct. at 2080.  The Court also made clear that liability does not extend up the chain of title.  The Court stated, "One important consequence of this provision is that

*Id.*

> We also note that the comment to TSA Section 33A(1), (2) provides,

> The phrase "person who offers or sells" in §§ 33A(1) and 33A(2) is taken from the U.S. law and is intended to have the same meaning, e.g., including a broker for the seller and, if he solicits, a broker for the buyer.  A broad interpretation of this sort implements the definitions of offer and sale in § 4E.  Even so construed, § 33A(1) [like 33A(2) and 33B] is a privity provision, allowing a buyer to recover from his offeror or seller [or a seller to recover from his offeror or buyer]. . . .

TEX. REV. CIV. STAT. ANN. art. 581–33A cmt. (Vernon 2010).

Drawing from analogous federal precedent and the definitions of "offer for sale" and "sell" provided in the TSA, we conclude that a "seller" for Section 33A(2) purposes can include "[a] person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner," such as a broker.  *See Pinter*, 486 U.S. at 646–47, 108 S. Ct. at 2078; *see also* TEX. REV. CIV. STAT. ANN. art. 581–4E (providing that, "the term 'sell' means any act by which a sale is made, and the term 'sale' or 'offer for sale' shall include a subscription, an option for sale, a solicitation of sale, a solicitation of an offer to buy, an attempt to sell, or an offer to sell, directly or by an agent").  Thus, Ryder Scott, as movant, had the summary judgment burden to conclusively

§ 12(1) imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers.  Thus, a buyer cannot recover against his seller's seller."  *Id*. at 644 n.21, 108 S. Ct. at 2077 n.21.

show that the brokers, from whom Appellants obtained the Unsecured Bonds, did not solicit the sale of the bonds "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." In other words, Ryder Scott had the burden to show that the brokers were not "sellers" as a matter of law. Ryder Scott offered no argument or evidence in this regard. Ryder Scott failed to meet its summary judgment burden on Appellants' claim for aiding a primary violation under Section 33A(2).[16] The trial court erred in granting summary in Ryder Scott's favor on this claim.

### 2. Claim for Aiding Primary Violation Committed by Issuer

Appellants also sued Ryder Scott under TSA Section 33F(2) for aiding Seven Seas, the issuer of the securities, in its primary violation of section 33C. *See*

---

[16] On appeal, Ryder Scott also contends that the trial court's summary judgment was proper "on the additional basis that there is no evidence that Ryder Scott materially aided" the brokers. The trial court granted a traditional summary judgment motion; it did not grant a no-evidence summary judgment motion. And the motion itself does not make this argument.

To the extent that its summary judgment motion can be construed to assert such ground, Ryder Scott did not meet its summary judgment burden to show that it did not materially aid a seller of the bonds. Ryder Scott offered affidavit testimony providing no more than a bare statement that it did not aid or assist any seller. In conjunction with this statement, the affiant, Don Roesle, states that Ryder Scott did not have any knowledge of who sold the bonds. As framed, Ryder Scott's assertion does not take into account that Section 33F(2) provides that the material aid can be given *indirectly* and still impose liability. *See* TEX. REV. CIV. STAT. ANN. art. 581–33(F)(2). Here, Appellants allege that the aid was indirectly given to the sellers through Ryder Scott's reserve estimates. Ryder Scott did not address this in its motion for summary judgment and thus, has not negated this element as a matter of law.

44

TEX. REV. CIV. STAT. ANN. art. 581–33(F)(2); *see also id*. art. 581–33(C). Section 33C places primary liability on issuers of registered securities purchased on a secondary market when the issuer has made an untrue statement of material fact in the prospectus under which those securities were issued. *See id.* § 581–33(C).

To hold Ryder Scott secondarily liable for Seven Seas's violation of 33C, Appellants would ultimately have to show that Ryder Scott, directly or indirectly, with intent to deceive or defraud or with reckless disregard for the truth or the law, materially aided Seven Seas in its 33C violation. *See* TEX. REV. CIV. STAT. ANN. art. 581–33(F)(2). Appellants alleged that Ryder Scott aided Seven Seas's Section 33C violation by supplying inflated proved reserve estimates for the Guaduas Field. They allege that Ryder Scott knew that Seven Seas would incorporate the reserve estimates into its SEC filings, including its prospectuses. Appellants allege that the untrue statement of material fact in the prospectus was the inflated proved reserve estimates for the Guaduas Field. The estimates were derived from the reserve reports prepared by Ryder Scott and given to Seven Seas for its use in its SEC filings.

### a. Material Aid

In its motion for summary judgment, Ryder Scott asserted that it was entitled to summary judgment because the proved reserve estimate contained in Seven Seas's prospectus was rendered immaterial by the prospectus' cautionary

disclaimer language. Ryder Scott contended that because the statement in the prospectus was "immaterial," it did not materially aid Seven Seas in a Section 33C violation.

In support of this assertion, Ryder Scott relied on the following disclaimer in the prospectus:

Risks Related to the Oil and Gas Industry

Uncertainty of Estimates of Oil and Gas Reserves

This Prospectus contains estimates of the Company's proved oil and gas reserves and the estimated future net revenues therefrom based upon the Company's own estimates or on those of Ryder Scott. . . . The process of estimating oil and gas reserves is complex, requiring significant decisions and assumptions in the evaluation of available geological, geophysical, engineering and economic data for each reservoir. As a result, such estimates are inherently imprecise. . . . Any significant variance in these assumptions could materially affect the estimated quantity and value of reserves set forth in this Prospectus. . . . In addition, the Company's estimated proved reserves may be subject to downward or upward revision based upon production history . . . and other factors, many of which are beyond the Company's control. Actual production . . . with respect to the Company's reserves will likely vary from the estimates used, and such variances may be material. . . .

Although cost and reserve estimates attributable to the Company's oil and gas reserves have been prepared in accordance with industry standards, no assurance can be given that the . . . results will be as estimated.

In its motion, Ryder Scott further pointed out that "[t]he Prospectus also warned that the reserve data represented 'only estimates,' that the estimates constitute 'forward looking statements,' and that '[t]here are numerous

uncertainties inherent in estimating quantities of proved reserves [and] future rates of production.'" Ryder Scott asserted, "Given these warnings and disclaimers, the reserve estimates do not constitute a material representation as a matter of law."

For purposes of the TSA, an omission or misrepresentation is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding to invest. *Tex. Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 776 (Tex. App.—Houston [1st Dist.] 2001, pet. denied); *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 649 (Tex. App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.). In arguing that the prospectus's cautionary language effects the materiality of the reserve estimates, Ryder Scott is seeking to apply the "bespeaks caution doctrine" found in federal case law. The doctrine addresses "situations in which optimistic projections are coupled with cautionary language—in particular, relevant specific facts or assumptions—affecting the reasonableness of the reliance on and the materiality of those projections." *Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir. 1994). "[C]autionary language is not necessarily sufficient, in and of itself, to render predictive statements immaterial as a matter of law. Rather . . . '[m]ateriality is not judged in the abstract, but in light of the surrounding circumstances.'" *Id.* at 167–68. Pursuant to this doctrine, when "forecasts, opinions, or projections are accompanied by meaningful cautionary statements, the forward looking statements will not form the basis for a securities fraud claim if

47

those statements did not affect the total mix of information" provided to investors. *In re Donald Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 371 (3rd Cir. 1993); *see Kapps v. Torch Offshore, Inc*. 379 F.3d 207, 214–15 (5th Cir. 2004) (recognizing that cautionary statements must be taken into account in determining whether a reasonable investor would have been materially misled). In short, "the 'bespeaks caution' doctrine merely reflects the unremarkable proposition that statements must be analyzed in context." *Rubinstein*, 20 F.3d at 167. Cautionary statements and warnings may render allegedly misleading statements immaterial, but only when they exhaust the misleading statement's capacity to influence the reasonable investor. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097–98, 111 S. Ct. 2749, 2761 (1991).

Federal courts have held that materiality is a mixed question of law and fact usually reserved for the trier of fact. *TSC Indus. Inc. v. Northway, Inc*., 426 U.S. 438, 450, 96 S. Ct. 2126, 2132–33 (1976); *see also Kapps*, 379 F.3d at 216. Nevertheless, "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality it is appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Shapiro v. UJB Financial Corp*., 964 F.2d 272, 280 n.11 (3d Cir. 1992) (citing *TSC*, 426 U.S. at 450, 96 S. Ct. at 2133). Here, the question is whether Ryder Scott, as summary judgment movant, conclusively

48

showed, as a matter of law, that the proved reserve estimate was not a material statement when read in the context of the prospectus' cautionary language.

The proved reserve estimate was made in the context of cautionary language using industry vernacular and citing factors that could negatively affect the ultimate determination of the proved reserves. The cautionary language was clear and prominent. However, the proved reserve estimate would be a preeminent consideration to an investor in Seven Seas; the proved reserves were Seven Seas' most significant asset.

An estimate contains at least the factual assertion that "there is a reasonable basis for the belief." *Rubinstein*, 20 F.3d at 166. Here, the reasonableness of the basis for Ryder Scott's estimate is explicitly stated in its reserve estimate: it is based on the methodology enacted in the "Securities and Exchange Commission (SEC) guidelines" (Regulation S-X) and is "based on the work performed by . . . Aguilera."

The Seven Seas prospectus also states the methodology used by Ryder Scott: the reserve calculations were made "in accordance with industry standards." At the heart of Appellants' claims is their contention that the proved reserve estimate was not made in accordance with industry standards: SEC Regulation S-X and the studies of Dr. Aguilera. The juxtaposition of this statement within the prospectus's cautionary language raises a fact issue of whether the cautionary language itself is

accurate and whether it should be permitted to exhaust the misleading statement's capacity to influence the reasonable investor. *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3rd Cir. 1996) (holding that "notwithstanding the cautionary language stressed by defendants, we think that there is a substantial likelihood that defendants' alleged misrepresentations—i.e., that the loan loss reserves were established in compliance with [Generally Accepted Accounting Standards] and were believed to be adequate to cover expected future losses given the then–existing economic conditions–would have assumed actual significance to a reasonable investor contemplating the purchase of securities"); *Rubinstein*, 20 F.3d at 171 (restating view that "'[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit'") (footnote omitted).

In its motion for rehearing, Ryder Scott cites *Truk International Fund LP v. Wehlman* to support its position that the cautionary language in the Prospectus rendered the proved reserve estimates "immaterial." 737 F. Supp. 2d 611, 623–25, (N.D. Tex. 2009), *aff'd*, 389 Fed. Appx. 354 (5th Cir. 2010). Admittedly, a superficial reading of *Truk* would initially lead to the conclusion that it is on point with the instant case. Similar to this case, *Truk* involved securities act claims against an oil company by investors, who alleged that they had relied on representations in the company's offering documents regarding proved reserve

50

estimates of oil and gas, which were later reduced. *Id.* at 615. Among the plaintiffs' allegations was the assertion that the company had not complied with applicable SEC guidelines and industry standards in making the initial reserve estimates. *See id.* at 622–23. The oil company pointed to cautionary language in its prospectus—similar to the cautionary language in this case—arguing that the language rendered any misrepresentation or omission immaterial with regard to the proved reserves. *See id.* at 615. The court agreed, holding that a reasonable investor would know from the cautionary language that the investment was risky and that part of that risk was the uncertainty of the proved reserves. *See id.* at 624–25.

Although similarities are apparent, a difference between *Truk* and this case is significant and controlling. As Appellants point out, the *Truk* court found it important that the plaintiffs in that case did not allege that the oil company had misrepresented the initial proved reserve estimates. *See id* at 623–24. Rather, the court noted that the plaintiffs' claims "are based strictly on alleged omissions." *See id.* at 623. Specifically, the plaintiffs alleged that the oil company had failed to disclose, in the initial offering documents, factors that resulted in the later reduction of the volume of the proved reserve estimate. *See id.* The character of the plaintiffs' allegations—omission versus affirmative misrepresentation—was

51

significant to the *Truk* court's determination that the prospectus's cautionary language rendered the initial proved reserve estimate immaterial. *See id.*

In contrast, Appellants here alleged that Ryder Scott made misrepresentations with respect to the process by which the proved reserve estimates were calculated. More precisely, Appellants asserted that Ryder Scott falsely stated that it had determined the proved reserve estimates in accordance with Regulation S-X. The cautionary language contained in Seven Seas's Prospectus did not alert Appellants that the regulation had not been followed. Thus, unlike in *Truk*, the cautionary language does not, as a matter of law, render the proved reserve estimate immaterial.

We conclude that Ryder Scott did not meet its summary judgment burden to show that the proved reserve estimates were not material as a matter of law. Summary judgment would not have been proper on this ground.

### b. Evidence of Scienter: Non-Compliance with Regulation S-X

In its motion for summary judgment, Ryder Scott asserted that it lacked the requisite scienter to be held liable for aiding a Section 33C violation. Specifically, Ryder Scott argued that it did not act with reckless disregard for the truth, as alleged by Appellants, when it prepared the reserve report from which the proved reserve estimate in the prospectus was derived. In this regard, Ryder Scott stated that it believed that the conclusions in its reserve report accurately reflected the

reserve estimates of the Guaduas Field as calculated "pursuant to applicable S.E.C. guidelines." Ryder Scott supported this statement with affidavit testimony by Don Roesle, its chairman chief executive officer.

Appellants responded,

The evidence from which a jury could infer that Ryder Scott rendered material aid to a primary violator (i.e., Seven Seas) in the face of a perceived risk that its assistance would facilitate untruthful or illegal activity by Seven Seas is Ryder Scott's material inflation of Seven Seas' reserve numbers by using a recovery factor of 30%, which required gas injection, at a time that Ryder Scott knew that no gas injection was occurring in the Guaduas Field. A jury could also infer that Ryder Scott was rendering material aid in the face of perceived risk that its assistance would facilitate untruthful or illegal activity by Seven Seas by inflating Seven Seas' proved reserve by classifying acreage as proved oil even when it was located more than one offset unit from a continuously producing well in clear violation of the controlling regulations for the preparation of proved reserves for documents that were to be filed with the SEC.

To support the foregoing assertions, Appellants offered the affidavit of Enrique Gonzalez-Gerth, its petroleum engineering expert. Gonzalez-Gerth testified as follows:

The assignment of a recovery factor of 30 percent to the Guaduas Field based upon continuous gas injection throughout the producing life of the Guaduas Field was inappropriate because there was no gas injection taking place at that time in the Guaduas Field. Furthermore, under the federal regulations that set forth the parameters for the calculation of proved reserves for incorporation into documents to be filed with the [SEC], i.e., Rule 4-10(a) of Regulation S-X of the Securities Exchange Act of 1934 ("Regulation S-X"), it would have further been inappropriate to assign a recovery factor based upon gas injection until such time as a pilot project or actual gas operation had confirmed through production response that injection would actually

53

result in increased production. A copy of Regulation S-X is attached hereto as Exhibit "C." The sections of Regulation S-X addressing the issue of gas injection are found at Section (a)(3) for "proved developed reserves" and Section (a)(4) for "proved undeveloped reserves."

. . . .

In addition to Ryder Scott's inappropriate use of the 30 percent recovery factor, there is also the issue of Ryder Scott's classification of undrilled acreage as proved reserves. Under Regulation S-X, proved undeveloped reserves are limited to those drilling units offsetting productive units reasonably certain of production when drilled.

Ryder Scott objected to the copy of Regulation S-X attached to Gonzalez-Gerth's affidavit on hearsay grounds. The trial court sustained the objection.

As mentioned, Appellants complain in their third issue that the trial court erred in sustaining the objection and presumably not considering Regulation S-X in its determination of Ryder Scott's motion for summary judgment. Appellants assert that a federal regulation, such as Regulation S-X, is not hearsay. *See* 17 C.F.R. § 210.4-10. The determination of Appellants' challenge to that the trial court's summary judgment ruling on their aider claim is intertwined with the determination of this evidentiary issue. Therefore, it is appropriate and necessary to now consider Appellants' third issue challenging the trial court's exclusion of Regulation S-X.

We review a trial court's decision to admit or exclude summary judgment evidence for an abuse of discretion. *See K-Mart Corp. v. Honeycutt*, 24 S.W.3d

357, 360 (Tex. 2000); *Hartford v. Lyndon–DFS Warranty Serv., Inc.*, No. 01-08-00398-CV, 2010 WL 2220443, *8 (Tex. App.—Houston [1st Dist.] May 28, 2010, no pet.) (mem. op.).  A trial court abuses its discretion if it acts without any reference to any guiding rules or principles.  *See Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex. 2002).  We must uphold the trial court's ruling if there is any legitimate basis in the record to support it. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).  We will not reverse a trial court for an erroneous evidentiary ruling unless the error probably caused rendition of an improper judgment.  *See* TEX. R. APP. P. 44.1; *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003).

In *Hickson v. Martinez,* the court held that the Code of Federal Regulations, which contained the standard of care hospitals receiving medicare and medicaid must observe, was not hearsay evidence because it did not contain an assertion of fact that was offered to prove the truth of the matter asserted.  707 S.W.2d 919, 927 (Tex. App.—Dallas 1985, writ ref'd n.r.e.).  Thus, the court held that it was error to exclude the regulations. *Id.*  Similarly, we conclude that Regulation S-X is not hearsay. *See id.*  The trial court abused its discretion when it sustained Ryder Scott's objection and excluded the regulation. *See id.*; *see also* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . .").

We next determine whether the exclusion of Regulation S-X probably resulted in the rendition of an improper judgment. *See* Tex. R. App. P. 44.1. Gonzalez-Gerth's affidavit testimony indicating that Ryder Scott did not comply with Regulation S-X directly refutes the affidavit testimony of Don Roesle indicating that Ryder Scott followed SEC guidelines in calculating the reserve estimates. Gonzalez-Gerth testified that Regulation S-X contains the applicable federal guidelines. Gonzalez-Gerth detailed how Ryder Scott failed to comply with certain provisions of Regulation S-X and cites those provisions. A review of those provisions in relation to Ryder Scott's proved reserve estimate, Gonzalez-Gerth's expert testimony, and Roesle's testimony raises a genuine issue of fact with respect to whether Ryder Scott acted with reckless disregard for the truth in providing the reserve estimate that was incorporated into Seven Seas' prospectus. Without the text of Regulation S-X, such review cannot be done. Thus, we conclude that the exclusion of Regulation S-X probably resulted in an improper judgment, namely, rendition of summary judgment on Appellants' claim that Ryder Scott aided Seven Seas in a violation of Section 33C.

In conclusion, we hold that Ryder Scott was not entitled to summary judgment on Appellants' claims that Ryder Scott violated Section 33F(2) by aiding the sellers of the Unsecured Bonds in violating Section 33A(2) and by aiding Seven Seas in violating Section 33C. *See* Tex. Rev. Civ. Stat. Ann. art. 581–

33(F)(2); *see also id.* art. 581–33(A)(2), (C).  We further hold that the trial court's error in excluding Regulation S-X probably resulted in the rendition of an improper judgment.

We sustain Appellants' first and third issues. [17]

## Conclusion

We affirm the portion of the trial court's judgment granting summary judgment with respect to the following: (1) Appellants' common law fraud and negligent representation claims against Ryder Scott; (2) Appellants' conspiracy claims against Chesapeake Energy; and (3) Appellants' claims that Chesapeake Energy violated Section 33F(2) of Texas Securities Act.  We also affirm the portion of the trial court's judgment dismissing Appellants' claims against Ryder Scott and Chesapeake Energy for aiding and abetting fraud.  We reverse the portion of the trial court's judgment granting summary judgment with respect to Appellants' claims that Ryder Scott violated Section 33F(2) of the Texas Securities

---

[17]    Because the issues discussed above are dispositive of this appeal, we need not reach any remaining issues raised by the parties, including issues relating to the trial court's denial of Ryder Scott's traditional motion for summary judgment on Appellants' common law fraud and negligent misrepresentation claims.

Act by aiding primary violations of Sections 33A(2) and 33C.  We remand the case to the trial court for further proceedings.


Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.